ALMON, Justice.
Daniel Realty Corporation (Daniel) brought this suit to recover commissions allegedly due it upon termination of its real estate management contract with Morris Avenue Corporation (Morris Avenue). The defendants other than Morris Avenue were the purchasers of the building which Daniel managed under the contract. They defended on grounds that they were not liable under the contract between Daniel and Morris Avenue. The jury awarded the full amount sought by Daniel, and the trial court entered judgment thereon and denied defendants’ post-trial motions. We affirm.
On April 1, 1974, Daniel contracted with Morris Avenue to manage the Bank for Savings Building for a period of five years. Morris Avenue owned the building; Birmingham-Southern College owned the stock of Morris Avenue. Daniel’s duties included seeking new tenants for the building, collecting rents, making and supervising repairs and alterations, hiring and supervising employees, and other duties related to managing the building. The contract provided for Daniel’s compensation as follows: “For obtaining tenants and leases and performing the continuing management service, Agent [Daniel] shall receive a compensation of five percent (5%) of the gross income collected from building and parking deck operations, excepting income from tenant improvements and utilities.”
Either party could terminate the agreement upon ninety days’ notice, but
“... in such event, Agent shall have a commission interest in future rentals paid by tenants obtained by Agent, and upon termination of this agreement for any reason except gross negligence or mismanagement or non-renewal of this agreement, Agent shall be entitled to receive compensation for this interest, to be calculated as follows: Based on an average tenancy of five years, apply the standard formula for determining the advance discounted settlement of commission interests in leases as prescribed by the Birmingham Real Estate Board, which would result in an amount equal to 2V2 times the annualized rate of commissions earned by Agent on leases negotiated by Agent on and after April 1,1974 at the effective date of termination of this agreement.”
On July 14, 1977, while the management contract was in effect, Morris Avenue transferred the Bank for Savings Building to Morris Development Associates, Ltd. (Morris Development); Birmingham-Southern College simultaneously transferred its stock in Morris Avenue to Altamont Associates, Ltd. (Altamont). Both transferees were Alabama limited partnerships, with Gary E. Smith (Smith) as the general partner of Altamont and Altamont as the general partner of Morris Development.
Smith was the moving force behind this transaction. He apparently learned that the Bank for Savings Building was in financial difficulty due to loss of tenants and approached the owners about buying it. Smith testified at trial that he felt the problems were due to mismanagement and that he could improve the operation of the building, attract new tenants, and sell the building at a profit. Smith was sole proprietor of Centennial Realty, a firm in the business of managing buildings.
Immediately after he and his partners purchased the Bank for Savings Building, *270 Smith notified Daniel Realty that he would assume the management of the building. Daniel wrote a letter to Smith on August 16, 1977, which included the following:
“As you know our Management Agreement for this building has a provision that either party may terminate the agreement by giving the other party a ninety (90) day written notice. Your letter dated July 29, 1977, is interpreted by us to be your 90 day written notice of termination of this agreement; therefore, we will be entitled to the compensation due our Company in accordance with Article 2 of the Agreement through the month of October 1977. ...
“The Management Agreement provides that if the Agreement is cancelled then our Company will have a commission interest in future rentals paid by tenants where the leases were negotiated by us. Our invoice for the commission due us under this provision of the agreement will be submitted to you shortly after October 1, 1977, the date on which the Agreement will expire due to cancellation.”
Daniel later submitted the invoice for $72,-344.32, of which $56,281.93 was for termination settlement and $12,513.18 was for three equal management fees of $4,171.06 for August, September, and October.
Smith replied by letter of August 19 that Daniel’s contract was with Morris Avenue, not Morris Development. He suggested that Daniel work out its claim with Charles Evans, the new president of Morris Avenue, who was winding down the affairs of the corporation.
Daniel claims that Morris Development, Altamont, and Smith assumed the management contract. The management contract contains the following clause:
“The provisions hereof shall bind, apply to, and insure [sic] to the parties hereto and to their respective successors, assigns, and legal representatives.”
Smith admitted at trial that he read the management contract before he purchased the property.
The sales agreement signed by Smith includes the following provision:
“(c) [Morris Development] shall pay [Birmingham-Southern College] within thirty (30) days following the end of each calendar quarter beginning with the first quarter after closing, and quarterly thereafter for one hundred (100) total quarters (Twenty Five (25) years) twenty percent (20%) of the ‘cash flow’ from [Bank for Savings Building], with ‘cash flow’ being defined as follows:
“The Income collected from the operations of [Bank for Savings Building] including all building rent, storage area rent, commercial area rent, parking area rent, utility income, discounts earned, and miscellaneous income, less the Expenses, which expenses shall include a management fee to Centennial Realty Company of five percent (5%) of the gross rents collected (less any amounts paid to Daniel Realty Corporation pursuant to the contract between [Morris Avenue] and Daniel dated the 1st day of April, 1974, a copy of which is attached as Exhibit 2); . .. . ”
(Emphasis added.)
Daniel contends that this reference to and annexation of the management contract constitutes an assumption of Morris Avenue’s obligations under the contract. Smith replies that the reference is only for the sake of defining “cash flow,” not for the sake of assuming the contract.
Smith’s argument raises a distinction without a difference. The provision defines “cash flow” as income less expenses; expenses include a management commission for Centennial calculated at five percent of gross rents less any amounts paid to Daniel under its management contract. This “definition of cash flow” serves to decrease Centennial’s commission proportionally to any amounts paid to Daniel; it thereby decreases expenses and increases cash flow. If the clause referring to Daniel’s commission were absent, Centennial would receive five percent of total gross rents; any amount paid to Daniel would presumably be an added expense, and the two commissions *271 would cumulate as expenses and thereby decrease cash flow. The net effect of this clause is to put the burden of Daniel’s commissions on Centennial (i.e., Smith) rather than on Birmingham-Southern.
For example, if Daniel was paid $4,000 in a month when gross rent was $40,000, Centennial would receive 5% of $36,000, or $1,800; this would be the total commission expense deducted from income to determine cash flow for purposes of paying Birmingham-Southern. Without the clause referring to Daniel’s management agreement, Centennial would receive 5% of $40,000, or $2,000. If $4,000 commission expense were paid to Daniel and considered an expense for determining cash flow, a total of $6,000 in commission expense would be deducted from income. Even if only the $2,000 figure is used, Smith and his partners have to some degree assumed the obligation of Daniel’s management contract by agreeing to reduce Centennial’s commission and pay Birmingham-Southern 20% of a larger cash flow figure if Daniel is paid.
Other factors strengthen the conclusion that Smith, and through him the partnerships, assumed the obligation of the management contract. Smith admitted that he read the contract, with its above-quoted provision that it would bind the parties and their respective successors and assigns, and yet he did nothing to try to limit such liability. In fact, Birmingham-Southern’s attorney testified:
“A. ... Its very clear to me that the point was made that the Management Agreement would survive the sale and that it would be Mr. Smith’s responsibility as to what happened to the management of the building after the sale. My recollection is very clear on that point.
“Q. Did you—
“A. I guess I should go ahead and say why my recollection is so clear. In the discussion with Mr. Smith he said to me that this is not the first time that he had the question about termination of management agreements come up, and that if he could not work out something with Daniel, that he would take the matter to the Arbitration Committee of the Birmingham Board of Realtors; but that he knew it was his problem and that he would work it out whatever way he could.”
These matters in the record support a finding by the jury that Smith, by implied or express agreement, assumed the obligations on Daniel’s management contract.
“... As a general rule, where one company sells or otherwise transfers all its assets to another company, the transferee is not liable for the debts and liabilities of the transferor unless (1) there is an express agreement to assume the obligations of the transferor, (2) the transaction amounts to a de facto merger or consolidation of the. two companies, (3) the transaction is a fraudulent attempt to escape liability, or (4) the transferee corporation is a mere continuation of the transferor. 15 Fletcher, Cyclopedia Corporations § 7122 (Perm. ed. 1973); 19 Am.Jur.2d § 1546.”
Andrews v. John E. Smith’s Sons Co., 369 So.2d 781, 785 (Ala.1979).
This rule also includes an implied agreement to assume the obligations of the trans-feror. See 15 Fletcher, Cyclopedia Corporations, §§ 7122 and 7124 (Perm. ed. 1973); Araser v, Inc. v. Bay State Harness Horse Racing and Breeding Association, Inc., 437 F.Supp. 1083 (D.Mass.1977); Hartford Accident and Indemnity Co., Inc. v. Canron, Inc., 43 N.Y.2d 823, 402 N.Y.S.2d 565, 373 N.E.2d 364 (1977). In Ladjevardian v. Laidlaw-Coggeshall, Inc., 431 F.Supp. 834 (S.D.N.Y.1977), the court observed:
“... While no precise rule governs the finding of implied liability, the authorities suggest that the conduct or representations relied upon by the party asserting liability must indicate an intention on the part of the buyer to pay the debts of the seller. Fletcher, supra § 7124. The presence of such an intention depends on the facts and circumstances of each case. One of the facts to be considered is the effect of the transfer upon creditors of *272 the predecessor corporation. See, e.g., In re Alamac Operating Corp., 42 F.2d 120 (2d Cir.1930); Blackington v. United States, 6 F.2d 147 (8th Cir.1925). In the instant case, plaintiffs charge that LAC became a mere ‘shell’ following its agreement with Laidlaw-Coggeshall.”
Id., at 839. Here the effect of the transfer if the purchasers did not assume liability would be to deprive Daniel of commissions due under the terms of the agreement. Morris Avenue’s primary, if not its only asset, was the Bank for Savings Building. At the same time Morris Development bought the building from Morris Avenue, Altamont bought all of Morris Avenue’s stock from Birmingham-Southern for $1,000. Clearly Daniel has no recourse except against Smith and the two partnerships.
Smith argues that the purpose of the transaction was to change management. This merely goes to prove that he did not assume the benefits of the contract with Daniel, and does not contradict the above evidence that Smith and partners assumed the liabilities under the contract. The appellants also argue that Altamont should not be liable because it merely purchased the stock of Morris Avenue. This argument falls, however, because Altamont’s liability is predicated on its status as general partner of Morris Development, not its status as stockholder of Morris Avenue.
Finally, the appellants assert that Daniel did not meet its burden of proof on damages. Daniel submitted a list of tenants in the building in July 1977 and gave termination expenses attributable to each. Smith contested most of the amounts on the grounds, inter alia, that some of the tenants were in the building when Daniel assumed management duties and some moved out before termination of Daniel’s management duties. Daniel countered that the contract allowed termination expenses for leases negotiated, not just tenants obtained, by Daniel. Daniel’s comptroller, Charles Tickle, testified that the list of tenants for whom Daniel claimed termination commissions included some old tenants for whom Daniel renegotiated leases but excluded old tenants whose leases did not expire during Daniel’s tenure and those whose leases were renewed automatically. Tickle contradicted the claim that some of the tenants on his list were out of the building at the termination of the contract. From the record it appears that a jury question was presented on these issues, so no reversal is mandated.
Appellants also argue that the agreement was properly terminated for mismanagement, so no damages or commissions are due to Daniel. Although evidence was presented of tenant complaints and conditions in the building that would indicate mismanagement, Daniel put on countervailing evidence. Daniel introduced two letters from Neal R. Berte, vice-president and later president of Birmingham-Southern, thanking Daniel for “the excellent work done by the Daniel Realty Company in managing the Bank for Savings Building.’’ Daniel’s witnesses testified that problems in the building were due to Birmingham-Southern’s inability to finance needed capital improvements to such things as the air conditioning system. Again, a jury question was presented and the trial court did not err in overruling the partnerships’ motion for j.n.o.v. or, in the alternative, for new trial.
Finally, the partnerships argue that the damages were excessive because the $12,000 award for commissions for August, September, and October was inconsistent with an award of termination commissions for tenants in the building as of July 29, 1977. The trial court answered this argument very well in its order denying the motion for j.n.o.v. or new trial.
“The award of such commissions for the 90-day period is inconsistent with a finding that July 29 was the effective date of termination. However, the defendants were found to have breached the management agreement by terminating the same without paying the compensation required under the agreement and also without giving Daniel the required notice. The Court concludes that the evidence is sufficient to support the jury *273 verdict. The jury could find from the evidence that Daniel was entitled to 90 days’ notice of termination and therefore due to receive its full commission on the gross rents received from tenants of the Bank for Savings Building for a period of 90 days. The jury also determined that the monthly rents for purposes of the management agreement should be determined as of the date when Daniel was removed from the active management of the building. After that date Daniel no longer had responsibility for the management of the building. Consequently, the jury could conclude that Daniel should not be charged with any loss of tenants thereafter.”
Finding no reversible error, we conclude that the judgment below is due to be affirmed.
AFFIRMED.
TORBERT, C.J., and FAULKNER, EM-BRY and ADAMS, JJ., concur.