## In re GUYANA DEVELOPMENT CORP., Debtor.

**Bankruptcy No. 93–41444–H5–11.**

United States Bankruptcy Court, S.D. Texas, Houston Division.

May 11, 1994.

---

Ruth Salek, Houston, TX, for debtor.

Louise P. Hytken, Dallas, TX, for U.S.

Marc E. Grossberg, Houston, TX, for Miami Real Estate Ventures, Inc. IV.

894

Patrick V. Strong, Houston, TX, for Edward Callan.

Marvin Isgur, Houston, TX, for trustee.

## AMENDED ORDER DENYING UNITED STATES' MOTION FOR RELIEF FROM STAY AND AWARDING TRUSTEE INTERPLEADER FUNDS

KAREN KENNEDY BROWN,
Bankruptcy Judge.

Before the Court are the United States' Motions to Lift Stay or for Adequate Protection, NationsBank's Interpleader Complaint, and the United States' Motion for Appointment of Trustee. In the course of the proceedings the parties agreed to the appointment of a trustee and that motion is now resolved. Responding to the motions and the complaint are debtor Guyana Development Corp. (GDC), Edward Callan and Edward Callan Interests (ECI), and Miami Real Estate Venture IV (MREV IV).[1] After hearing the evidence and considering the arguments of counsel and the law, the Court finds:

## I. POSITIONS OF THE PARTIES

Guyana Development Corporation, (GDC), a Delaware corporation, is indebted to the United States for corporate income taxes for the years 1988 and 1989 in the approximate amount of $32,750,000 ($38,000,000 less credit for $5,250,000 paid in 1992). In late January and early February 1993, the IRS levied on real property and on bank accounts held in the name of Miami Real Estate Venture IV (MREV IV), a Florida corporation.

The United States makes two motions to lift the stay or to have debtor provide adequate protection, alleging that debtor GDC owns MREV IV indirectly through its ownership of the stock of South West Properties Holdings, Inc. (SWPH), a Texas corporation, and the MREV IV parent company. The United States urges nominee status or alter ego relationship between GDC, MREV IV, SWPH, Guyana Joint Venture Partnership (GJVP), GJVP subsidiaries, and Edward Callan and Edward Callan Interests (ECI).

The United States claims funds involved in the NationsBank interpleader for the same reasons. In addition, the United States urged the appointment of a trustee, alleging that debtor has been grossly mismanaged and fraud has been committed against creditors of debtor by the then management and 100% preferred shareholder of GDC, Edward Callan.

During the hearing, the Court ordered bank accounts of GJVP and MREV IV frozen until resolution of the matters at issue. Thereafter, Edward Callan, on behalf of ECI, resigned as manager of debtor.[2] The Court then appointed David Askanase as trustee of debtor on December 16, 1993. Debtor, Callan, and MREV IV agreed to this appointment. The trustee and the United States agree that the IRS interest in the property at issue is adequately protected. In response to the claims of Callan, debtor, and MREV IV asserted to resist the government's motion to lift stay and the government's position in the interpleader action, the trustee alleges alter ego status between debtor and the assets of Callan, ECI, GJVP, SWPH, the parent company of MREV IV, and GJVP. The trustee does not allege alter ego between MREV IV and GDC or GJVP subsidiaries and GDC.

MREV IV, Edward Callan, ECI, and debtor jointly defend against the allegations of the trustee and the United States. They contend that the IRS nominee liens are invalid for failure to follow the procedures of the Internal Revenue Manual. Moreover, they urge the rights of both the United States and the trustee are limited by a closing agreement between GDC, Callan, and the IRS signed on August 11, 1992, which allocated responsibility for the taxes to GDC, not Callan. They contend that the United States' allegations of nominee or alter ego are improperly brought against MREV IV and/or Edward Callan. They assert that SWPH and, thereby, MREV IV, is not owned by GDC. Instead, they alleged at first that Edward Callan owned SWPH. Subsequent-

---

1. Callan and MREV IV filed claims in this case.

2. A position to which he had never been appointed by the Court.

ly, they alleged that Edward Callan and his ex-wife, Debbie Callan, owned it.

In addition, during the proceedings, Edward Callan's 1990 divorce decree and a post-nuptial agreement were introduced which appear to give one-half of SWPH stock, the parent company of MREV IV, to Debbie Callan, his former wife. Mrs. Callan was given an opportunity to join the proceedings as a necessary party. She entered an appearance and participated for a short time in the proceedings. Thereafter, the Court found that her exact interest in the SWPH stock would be determined at a later date. Mrs. Callan represented to the Court that she had no evidence to offer on the alter ego question being litigated.

## II. HISTORY OF DEBTOR AND RELATED ENTITIES

### A. Guyana Development Corporation (GDC)

Debtor Guyana Development Corporation (GDC) is a shell corporation.[3] It has no employees. It was incorporated on May 5, 1988, as a device to use the net operating loss of another corporation, Geophysical Systems Corporation (GSC), then in bankruptcy in California, to write off most of the income tax due on a $53 million gain by Edward Callan and his then wife, Debbie Callan. The gain came from the sale by the Callans of Massachusetts real estate projects known as Edgewater and Inwood. The plan to write off the taxable gain fell through, and in the five years to date Callan or Callan-related entities paid only part of the taxes.[4]

Upon formation of GDC, Callan transferred to it the $53 million in sales proceeds from his Edgewater and Inwood developments.[5] GDC was structured by Callan's lawyer as a subsidiary of GSC in order to comply with tax code requirements for utiliz-ing the net operating loss of GSC. Thus, the structure provides that GSC owns 80% of the common stock of GDC and Callan owns 20% of the common stock of GDC. Consequently, GSC had majority ownership and voting control over GDC.

Callan also owns 100% of the preferred stock of GDC. Although the common stock was initially the only stock eligible to vote, after April 30, 1990, Callan, as preferred shareholder, would be entitled to vote for one of the three directors if GDC defaulted on two consecutive or three cumulative quarterly dividends. (GTX 11, p. 11, ¶ 6).[6] Also, under the GDC articles of incorporation, Callan's preferred stock had a preference on liquidation to the extent of the $53,000,000 contribution by Callan from the Edgewater and Inwood sales.

GSC never voted its common shares or controlled any actions of GDC from the time of GDC's incorporation on May 5, 1988. Further, Sam Allen, President of GSC, resigned from GDC as vice-president and director on July 2, 1990, and thereafter, GSC never had its own representative as officer or director of GDC. After Allen resigned, the GDC directors and officers were changed without shareholder meeting, vote, or explanation at the discretion of Edward Callan. Callan himself resigned as director in June, 1990, attempting to avoid responsibility for GDC's tax liability. However, Callan continued the same absolute control over GDC that existed prior to his resignation.

According to the GDC corporate bylaws and certificate of incorporation, holders of preferred stock may get dividends as declared by the board of directors. (GTX 11, ¶ 3). The bylaws require the dividends to be formally declared. There is no evidence that dividends were ever declared by the board of directors of GDC. Nevertheless, Callan took

---

3. GDC was not in existence under the laws of the state of Delaware at the time of the petition. It became void as a corporation on March 1, 1992, for the nonpayment of taxes. After the proceedings began, its Delaware charter was reinstated.

4. In 1992, in an attempt of offer in compromise, MREV IV, another Callan-entity, paid $5.2 million toward the taxes owed by GDC.

5. Callan contends that he had additional personal monies derived from a previous refinancing of Stage I of the projects which were invested in SWPH and other Callan interests.

6. No declaration of default is in evidence. No declaration of dividends ever occurred although Callan transferred funds freely from GDC and GJVP to himself and to other Callan projects.

a dividend of $800,000 on July 1, 1988, from GDC. (GTX 123).

In 1989, the proposed GSC/GDC tax write-off fell through. GSC was not current on its tax returns and no timely extension for the filing of a return on a consolidated basis was ever filed. As a result, after March 1989, GDC was unable to file a consolidated return for 1988 or 1989 along with GSC and, therefore, was unable to use GSC's net operating loss. GDC never filed income tax returns for 1988 or 1989.[7]

## B. Guyana Joint Venture Partnership (GJVP)

Guyana Joint Venture Partnership (GJVP) is a joint venture between GDC and another Callan entity, Eldorado, an Isle of Man entity.[8] Callan created GJVP, on May 6, 1988, the day after GDC was incorporated, to avoid the limitations imposed by the corporate structure of GDC. With this joint venture Callan regained control of his $53 million capital contribution to GDC by having GDC contribute the money to GJVP. Although the GSC bankruptcy case remained pending until August 1993, there is no evidence that what ensued regarding the operations or assets of GJVP was ever reported to the California bankruptcy court.[9]

Callan retained control over all GDC assets and operations through GJVP. Eldorado was supposed to contribute $10 million to the joint venture as well but it failed to do so. Nevertheless, the GJVP partnership agreement appoints Callan, as president of Eldorado, managing venturer with absolute discretion regarding the management of GJVP in-

cluding, among other things, what matters should be submitted to a vote of the venturers and what charges to assess against GJVP. (GTX 25, p. 4). In exercising this discretion Callan never submitted anything to a vote of the joint venture partners. Callan later removed himself from Eldorado, but the Court finds he never removed himself as manager of GJVP and continued to personally operate the venture.

Furthermore, under the bankruptcy court-approved agreement with GSC, Callan was to personally pay $1 million to GSC for seismic consulting work to GJVP. Instead, however, Callan had GJVP pay this sum. There is no evidence that this $1 million was ever charged to Callan through an "owner's draw," or by offsetting balances between his companies, or otherwise.

After 1988, Callan proceeded to use GJVP assets to obtain international oil and gas concessions. Describing GJVP as a "landman" to the major oil companies, Callan spent over $40 million in five years on projects which to date have only speculative value. Specifically, he formed the following entities[10] for projects in foreign countries: Colossus Petroleum LTD (Isle of Man); Casamance Petroleum LTD (Isle of Man); Karak Petroleum Pakistan LTD (Isle of Man); Meridian Exploration & Production Co. LTD (Isle of Man); Petromineros Del Peru LTD (Isle of Man); Petromeros S.A. (Columbia); Balkan Explorers (Ireland); Guyana Exploration LTD (Isle of Man); South Cat Cay (Bahamas); Eldorado LTD (Isle of Man); North African Petroleum LTD; Ashby Park; Asher LTD (Isle of Jersey), and Edward Callan Interest LTD (Isle of Man). (See

---

7. By June, 1990, Arthur Anderson, the accounting firm hired to prepare the consolidated return, advised ECI that a consolidated return could not be filed. Accordingly, in June, 1990, Arthur Anderson sent to ECI a return for GDC prepared on a separate return basis which reported a tax liability of $17,616,128. This return was never filed. Subsequently, other returns were prepared for GDC showing different liabilities; none of which were filed.

8. In 1989, Callan removed himself from the office of president of Eldorado and placed his uncle, Fernando Marquez, in that position. Marquez is a Mexican national and resident. The Court finds that Marquez is a figurehead. Callan

controls Eldorado. Callan removed himself from Eldorado because he desired to participate in oil and gas transactions in Libya, which were illegal for United States citizens. With Marquez in ostensible control of Eldorado, Callan might avoid the appearance of violating United States law.

9. In December, 1990, Callan reported the value of GDC stock on his financial statement in excess of $70 million. In accordance with the corporate structure, any GDC value over Callan's $53 million contribution was owned 80% by GSC, an entity in bankruptcy.

10. No evidence was offered that these entities were legally formed.

Appendix A.) In addition, he formed a Virgin Island corporation for the purchase of a $380,000 boat in August, 1993, known as "The Scorpion."

## C. The Callan Divorce

In May 1990, Callan entered into a post-nuptial agreement with his then wife, Debbie. Among other things, this agreement provided for Callan to give fifty percent (50%) of the SWPH stock to Debbie Callan as her separate property. (See Schedule A, Court Exhibit 1.) The parties' Agreed Decree of Divorce dated May 15, 1991, reflects that each of the Callans owned 50% of this stock.[11]

Additionally, under the post-nuptial agreement, Callan was to create the Callan Children's Trust to hold 100% of the preferred shares of GDC. The trust papers were apparently completed by Callan because a trustee was appointed. However, GDC's corporate books do not reflect the transfer of stock into the trust because, Callan contends, he could not obtain consent to the transfer from Sam Allen, the president of GSC. The Court finds this argument lacks credibility in view of Callan's disregard of GSC voting rights on all other GDC matters. Furthermore, Sam Allen resigned as corporate officer and director of GDC in July 1990, two months after the date of the post-nuptial agreement which mandated the creation of the children's trust. After his resignation, Allen was replaced on the GDC board of directors by John Livingston from Columbia and Alberto Puerto from Guyana appointed at the direction of Edward Callan. The Court finds that Callan's purported inability to obtain Sam Allen's consent was not an impediment to the transfer of stock to the trust. Rather, Callan avoided transfer of the stock to the trust, as he would later try to avoid the transfer of shares of SWPH to GDC, which the Court discusses *infra*, simply to further his own interests.

## D. Miami Real Estate Venture IV (MREV IV) and South West Properties Holdings, Inc. (SWPH)

Debtor indirectly owns at least one-half the stock of MREV IV through debtor's ownership, in part or in whole, of the stock of SWPH, a Texas corporation. Debtor's 1990 and 1991 United States corporate income tax returns show SWPH and MREV IV as subsidiaries. MREV IV is a subsidiary of SWPH. On these consolidated returns debtor claimed losses from SWPH and/or MREV IV to offset income from GJVP's $53 million. Consequently, debtor was able to write off approximately $500,000 in taxes.

MREV IV owns the Florida Power & Light (FP & L) Building in Miami, Florida. Callan used GDC funds to purchase the land on which the FP & L Building was constructed. NationsBank financed the remaining costs of construction with a loan to MREV. Callan personally guaranteed this loan to MREV. Callan represented to NationsBank on his financial statement provided in the fall of 1990 that he owned the preferred stock in debtor, GDC, and that the value of such GDC stock was between 60–70 million dollars. (GTX 38). Callan failed to inform NationsBank that any asset value exceeding his capital contribution of $53 million was owned 80% by GSC, an entity in bankruptcy. Callan also failed to inform NationsBank that in May of that year he agreed in his post-nuptial agreement Debbie Callan owned one-half of SWPH stock as her separate property.

The FP & L Building is 100% occupied by the Florida Power & Light Company which leases from MREV IV. Under the lease, FP & L maintains the building and property insurance for the building. The lease began on March 8, 1992, with an initial term of 25 years. The lease provides for four (4) five-year extensions. The initial rent was $4,450,-

---

11. While the post-nuptial agreement fails to list Edward Callan's ownership of the other fifty percent of SWPH stock in his list of separate property (Schedule B), that omission is corrected in the Agreed Decree of Divorce dated May 15, 1991. (Exhibit B). The United States contends that the Addendum to the Post–Nuptial Agreement dated April 30, 1991, creates a "cash-out" provision, whereby Edward Callan would pay $2 million to his ex-wife in return for her agreed amendments to the Post–Nuptial Agreement, which includes the return of the SWPH stock to Callan. In order to avoid further prolonging the trial, the Court reserved that issue for another day.

000 per year paid monthly with escalations geared to the consumer price index after year four. The substantial income stream provided by this 100% occupancy lease greatly enhances the fair market value of the FP & L Building over that of other similar buildings.

MREV IV maintained some corporate formalities. The state corporate charter never lapsed. Richard Yarborough was employed as a corporate consultant to MREV IV from early in the FP & L/NationsBank negotiations and filled various MREV IV corporate offices thereafter. MREV IV maintains its own bank account and conducts a legal business that is commercially successful. Nevertheless, Edward Callan is the only signatory on the MREV IV bank account at NationsBank. Moreover, MREV IV pays exorbitant "management fees" to ECI unrelated to management activities actually performed.

Callan and GDC, through their taxpayer representatives, consistently represented to the IRS that the FP & L Building, either directly or indirectly, was an asset of GDC. The SWPH stock issued to Callan was endorsed by Callan to GDC. Callan and debtor now claim, however, that GDC merely holds the stock of SWPH as a nominee for Edward Callan and that he never intended to actually transfer the stock to GDC.[12]

The evidence shows that Joe Bond, Callan's attorney, and David Rader, Callan's C.P.A., repeatedly advised Callan to transfer the SWPH shares from himself to GDC to offset the constructive dividends Callan received from his use of GDC assets in purchasing the land for the FP & L Building and for other Callan projects such as the Edgewater yacht. (GTX 162 and GDC 70). Specifically, in a memo dated July 7, 1990, Rader advised Bond and Callan that Callan had a serious problem created by Callan's discretionary transfers of GDC/GJVP funds.

*Id.* Rader believed, however, that Callan had sufficient investment of personal funds in SWPH which, if the stock were transferred to GDC, would offset any constructive dividends the IRS might assert against Callan because of his use of GDC/GJVP funds for his other projects. Subsequently, Rader understood that Callan had in fact completed the stock transfer and no longer was concerned about Callan's tax exposure.

Callan argues that his attorney, Bond, pressured him to sign the share transfer certificate. Callan asserts, however, that he retained the executed stock certificates of SWPH in his possession and did not have those formally entered on the corporate books and minutes of SWPH; so no actual transfer of the shares to GDC ever occurred. Callan testified he never intended to formally transfer the shares because he is personally liable on the guarantee to NationsBank for the MREV IV note owed on the FP & L Building. He argues that he would never have completed the SWPH stock transfer because of this personal guarantee.

Regardless of whether Bond and Rader accurately assessed Callan's potential liability and the appropriate cure, it is undisputed that Callan repeatedly transferred GDC/GJVP funds to himself or other Callan-controlled projects. It is further clear that Callan hired Bond and Rader for their professional advice on matters such as this and complied with their advice, at least to a point. Callan was advised to transfer the SWPH stock to GDC and he did so. In fact, Callan appears to have signed numerous stock certificates in blank for use as the need arose.

Callan had absolute control over all directors and officers of SWPH at all times from 1988 to date. Callan himself was a director of SWPH from 1988 to date. He was either vice president (1988–1990) or

---

12. Callan's shift in position regarding ownership of the SWPH stock suggests either the statements by his accountants and attorneys to the IRS from 1991 to August 11, 1992, that GDC owned SWPH, were false representations designed to induce the IRS to join in the closing agreement or his representations to this Court that he now owns the stock are fraudulent. Callan says that he was unaware that his representatives told the IRS for over a year that SWPH was owned by GDC. Moreover, mid-trial the post-nuptial agreement came to the attention of the Court. (Court Ex. 1). That instrument on its face combined with the divorce decree reflects one-half ownership of SWPH shares in Debbie Callan. Edward Callan now says Debbie Callan owns 50% of SWPH (although the IRS disagrees). The Court finds Callan to be entirely lacking in credibility.

president of SWPH (1990 to date). The by-laws of SWPH give both the president and vice president power to sign certificates of stock. The SWPH corporate minutes show no entries at all for original stock issued, including the original issue of shares to Edward Callan or subsequent transfers of stock. The absence of a formal corporate minute entry is a minor omission in view of Callan's complete control of all corporate actions of GDC and SWPH. There was no coercion or duress by Bond to compel Callan to transfer SWPH shares to GDC.

After the certificates were executed, Yarborough, as President of MREV IV and SWPH, in summer, 1991, signed and back-dated the stock certificate transfer to January 1, 1989, a time predating Yarborough's appointment as president. It is unclear why that date was chosen. Nevertheless, the Court finds that Callan intentionally executed a stock certificate transferring ownership of the stock of SWPH to GDC. Even if there was no formal entry on the corporate minutes of SWPH, such certificate effectively transferred ownership to GDC of whatever shares Callan owned after the post-nuptial agreement. GDC owns Callan's interest in SWPH.

As further explanation for the SWPH stock transfer, in 1989–1991, Callan and Debbie Callan were divorcing. Several witnesses testified that Callan repeatedly said that assets should be transferred in a divorce to hide them from the divorce court and the other spouse. After reviewing all the evidence at trial, the Court finds Callan believed he could conceal the substantial FP & L lease proceeds, an indirect asset of SWPH, by transferring the stock to GDC and controlling the lease proceeds through ECI.

Moreover, Callan understood that SWPH would create substantial income and, therefore, further tax liability. In early 1990, the building was nearing completion and within a matter of months the lease with FP & L would likely be returning proceeds to Callan. By transferring ownership of the SWPH shares from himself to GDC, 80% owned by GSC, the possibility existed that he might avoid taxes the IRS might otherwise find attributable to himself.[13] Such an action is consistent with Callan's often expressed intent to remove assets from his own name to avoid personal liability for taxes.

After reviewing all the evidence, the Court finds that it was Callan's intent to channel MREV IV/SWPH income through GDC and GJVP. Then Callan would create numerous projects where the MREV IV proceeds would not be reached by the IRS.[14]

Callan's argument that he would never have transferred SWPH stock because he was personally liable on the construction note is simply implausible. Apart from the fact that Callan previously agreed to give 50% of the SWPH shares to Debbie Callan in the community partition, no party disputes that the market value of the FP & L Building and the attendant lease exceeded at all times the construction note to NationsBank. There was little likelihood that Callan's guaranty would ever be called.

### E. Allied Maritime, Inc. (AMI) and Colossus Petroleum

A subsidiary of debtor, Allied Maritime, Inc. (AMI), a Delaware corporation, had a partnership with Colossus Petroleum, an Isle of Man corporation, named Four Leaf Partnership, Ltd. Four Leaf Partnership, Ltd. owned a penthouse located in the Four Leaf Tower building in Houston. Consequently, this penthouse was indirectly owned by debtor: (1) through its ownership of Guyana Joint Venture Partnership (GJVP) which in turn owns Colossus Petroleum; and (2) through debtor's 100% ownership of AMI. Although the penthouse was held in the part-

---

**13.** Callan repeatedly told witnesses that assets should be kept out of his name to hide them from creditors generally.

**14.** The transfer to GDC and GJVP diverted monies away from the IRS. In late 1991, after the audit was complete, Revenue Agent Jeanie Kelm spoke with Callan by phone. Kelm asked Callan how he proposed to pay taxes owed on the 1988 gain. Callan replied, unless his oil projects came in, the IRS would get nothing. At the end of 1991, debtor's records reflect over $17 million in assets which would have been available to pay the IRS debt. By the date of filing bankruptcy, debtor's petition alleged few assets of discernible value held by GJVP.

nership name, it has been used as a personal residence by Callan since 1990. Callan contends that the penthouse and its contents were transferred to him in 1991. The IRS and trustee assert that no genuine transfer of title to the property occurred or if it occurred, it was effective only as of February 9, 1993.

Although Callan resided in the penthouse for two to three years prior to GDC's bankruptcy, he filed a warranty deed transferring the property to himself on February 9, 1993, only thirteen days before the bankruptcy was filed.[15] There is no evidence that Callan ever paid rent for his use of the property. Callan paid no money to Four Leaf Partnership, Ltd. to purchase the condominium but he contends he gave a note to Colossus Petroleum for $800,000 and that he has paid for $200,000–$300,000 in renovations to the property. Callan failed to make any payments on the mortgage note to Colossus Petroleum. Moreover, Callan continued to have his housekeeper's expenses related to the penthouse written off by AMI and later Colossus Petroleum as business expenses. Callan is now attempting to sell this penthouse for approximately $1,295,000.

AMI, a subsidiary of debtor, owned numerous oil rigs. Edward Callan Interests (ECI), discussed *infra*, continued to manage AMI post-petition with no application or notice to this Court. In the summer of 1993, all rigs were auctioned at the direction of Callan without notice to or the permission of this Court. Over $1.5 million was obtained. This money was thereafter diverted by Callan to ECI and to offshore oil and gas operations of affiliated concessions of GJVP. As of December 7, 1993, only $54,966.45 remained in the accounts of AMI. This sum was apparently earmarked for environmental cleanup expenses.

### F. Eldorado and Chemsul, Ltd.

Eldorado, GJVP's alleged joint venture partner, purportedly executed a note to

GJVP for $12 million. In November 1992, three months prior to this bankruptcy filing, in an effort to write off this note as worthless, GJVP purportedly sold the note to Chemsul, Ltd., an entity created by Callan. As part of this transaction, GJVP indirectly supplied Chemsul, Ltd. with $2 million to purchase the note. Of the funds originally transferred by GJVP to Eldorado, there remains possibly funds of approximately $9,500,000 in a bank account at the Arab Banking Corporation.

### G. Guyana Exploration Limited (GEL)

Guyana Exploration Limited (GEL) owns a commodities account which was levied on by the IRS. The funds in the commodities account came from GDC through GJVP.[16] GEL is one of the numerous GJVP subsidiary corporations created by Callan in his management role over GJVP and is purportedly incorporated in the Isle of Man. There is no evidence that GEL is legitimately incorporated under Isle of Man law. There is no evidence that GEL ever complied with corporate formalities or operated independently of Edward Callan. However, the trustee does not assert alter ego status for GEL.

### H. Petromineros–Columbia

The only GJVP oil and gas concession which ever had commercially profitable wells was Petromineros–Columbia. Nevertheless, according to Callan, this concession was not of sufficient producing value to retain. Allegedly, Callan sold it in 1991 or 1992 for $500,000 to Humberto Taron, an employee of Petromineros–Columbia.

In 1992, Callan's representatives submitted an offer in compromise to the IRS alleging that debtor was unable to pay its tax liability. After the closing agreement was signed in August, 1992, Callan directed the establishment of a NationsBank account for Petromineros–Columbia. While Callan alleges

---

**15.** While the warranty deed is dated "effective as of December 15, 1991," the notary signature is dated February 9, 1993, the same date the deed is filed of record. The warranty deed is signed by George Burgher and Richard Yarborough, two long-time consultants hired by Callan and ECI. The Court finds that the transactions date

of December 15, 1991, is intended to mislead creditors.

**16.** Proceeds from this account were reported as income on the 1990 GDC corporate return.

that Petromineros–Columbia was sold for a loss in either 1991 or 1992, both pre-petition dates, it is apparent from the United States' exhibits and witnesses that Callan continued to control Petromineros–Columbia to the present and appointed his own director and vice president; namely, George Burgher and Donald Yarborough, Callan's consultants. Burgher and Yarborough signed signature cards at NationsBank on October 26, 1992, in order to establish operating accounts for Petromineros. The United States argues that Callan continued to control Petromineros–Columbia assets and the purported transfer of the Columbian concession was a sham transaction designed to delude the IRS into believing that these assets were no longer owned by GJVP.

The evidence is inconclusive as to the validity of this sale. (GTX 75). Callan turned over to the trustee sums he alleges represent partial payment of the purchase price by Taron. However, given the Chemsul transaction and Callan's lack of credibility, this Court cannot be certain that the transaction is legitimate and directs the trustee to report his position on the validity of the sale to the Court within 60 days.

## I. Edward Callan and Edward Callan Interests (ECI)

██ Edward Callan Interests (ECI), is a sole proprietorship of Edward Callan. Callan managed all policy and day-to-day decisions for all Callan companies from ECI–Houston or ECI–London.

No management contract exists between ECI and any Callan entities and there is no prearranged management fee. ECI charges the Callan entities' fees for management unrelated to reasonable management fees available in the market place or to work actually done. The ECI management fee was a calculation done by the accountant at year end

by which the expenses and overhead of ECI were divided arbitrarily among the Callan-companies (⅕ MREV IV, ⅕ AMI, ⅕ GJVP).

Once the corporations were created, Callan used ECI to ignore corporate formalities. Specifically, there were no regular shareholder's meetings, few director's meetings, and corporate resolutions were largely executed to reflect actions already taken by Callan. No annual financial statements were produced.[17] Tax returns were sporadically filed for the corporations, if at all.[18]

As to GDC specifically, no officer had any independent authority over the company.[19] The corporate secretary who signed the GDC bankruptcy petition and schedules is a receptionist who performs bookkeeping functions for ECI.

All officers and directors of Callan-related entities were employed and/or controlled by Callan in some manner.[20] As George Burgher testified, he himself resisted appointment to corporate officer and director positions not related to oil and gas as long as he could. When he gave in, Burgher was appointed to Colossus Petroleum as president and MREV IV as vice president and director, among others, but was only given information on a need-to-know basis. He explained that as an officer of Callan-entities, he signed whatever was put in front of him. Fernando Marquez, as nominal president of Eldorado, was never genuinely consulted as to corporate decisions. Lillian Callan, Edward Callan's sister and an ECI–Houston employee, signed Marquez' name to corporate documents routinely. The Court concludes, based on the evidence at trial, that all directors and officers of GDC, SWPH, AMI, Colossus, GJVP, MREV IV, and all GJVP-related affiliates are figureheads for Edward Callan.

---

17. MREV IV is the exception. Financial statements were required by NationsBank as a condition of financing the Florida Power & Light Building.

18. GDC and SWPH filed consolidated returns in 1990 and 1991. Only after the IRS liens and levies and this bankruptcy case were filed did SWPH file a separate 1992 return.

19. For example, only Callan was authorized to sign checks in excess of $1,000.

20. Callan would frequently name as corporate officers individuals who had little knowledge about the corporation and whom he could control. On one occasion, Callan appointed his gardener and on another his airplane pilot to be officers of his companies.

Callan personally directed the transfers of funds between his controlled corporations. In his own words—when he calls from Europe to his ECI financial department, his only concern is "how much money is available" for use in his current project. Although transfers have involved millions of dollars, no loan documents are executed. These "loans" are interest free and without any specific repayment schedule.

GDC/GJVP initially contributed approximately $6 million to SWPH/MREV IV to fund the purchase of land on which the FP & L Building was constructed. GJVP funds of approximately $5 million in Switzerland were used to secure a SWPH line of credit in 1990. GJVP monies were routinely used to secure loans to Callan. SWPH paid substantial monies to GJVP concessions. AMI paid the housekeeping services for Callan's penthouse. Similarly, in the summer of 1993, Callan transferred $1.5 million, the auction proceeds on the sale of all of AMI drilling rigs, for use on GJVP subsidiary oil drilling projects.[21]

At best, the intercompany transfers are accounted for after the end of the year with various accounting entries. To the extent that outside accountants tried in good faith to reconcile and categorize the expenses between the companies, this effort was hamstrung by Callan's chaotic, self-serving approach to the companies and their assets.

GDC/GJVP funds have underwritten the salaries and expenses of Callan and ECI since GJVP was created. GJVP funds were used to pay for every Callan project. While Callan urges that he had approximately $6 million in separate funds apart from his contribution to GDC, there is no evidence that Callan's personal funds were segregated from GDC/GJVP funds. Instead, the evidence suggests that Callan's pre-Edgewater sale monies invested in SWPH were consumed in part by losses on Houston real estate deals in 1987–1988. GJVP money has been squandered on speculative oil and gas concessions. MREV IV stock, because of the FP & L Building, is the only Callan-related

asset producing income other than interest on bank accounts.

The Court finds Callan failed to prove any pre-1987 assets are still owned by Callan, apart from the Massachusetts residence. More importantly, at issue is not transfers from GDC to Callan pre-1987 but the complete identity of GDC and Callan.

Callan used GDC/GJVP and SWPH monies obtained from MREV IV funds as his own from 1988 onward. The United States and the trustee documented several million dollars funneled from GJVP to ECI and Callan directly. Callan agrees that the monies were held in corporate or GJVP name but were spent by him through ECI. Callan disagrees with the trustee that such a system shows an alter ego relationship because he says he was performing corporate services for the companies through ECI.

However, Callan repeatedly took actions that are both inexplicable and not in the best interests of his corporations. For example, prior to the closing agreement, the IRS gave Callan a choice as to how the taxes might be designated between Callan and GDC. Callan elected to tax GDC and not himself. The tax due from GDC was higher than the tax which would have been due from Callan. Thereafter, Callan claimed SWPH belonged to him and not debtor, thereby attempting to disable debtor from paying the tax.

Similarly, Callan put SWPH through elaborate financial maneuvers for no comprehensible corporate purpose. For example, in 1990, SWPH sought a line of credit through Bank Julius Baer, Switzerland in the amount of $5 million. This line of credit was secured by GJVP funds. SWPH then spent the monies to fund GJVP oil and gas concessions. GJVP is supposed to operate the oil and gas concessions; Callan has never explained why SWPH spent money on the oil and gas concessions.

Callan repeatedly used corporate assets for his personal use. A yacht, "The Edgewater," was purchased by Callan in the name of SWPH and refurbished with GJVP money

---

21. The auction of the assets of AMI was concealed from this Court. The transfer of the auc-

tion proceeds was concealed from this Court.

in 1989.[22] The yacht was chartered one time by a third party. The remainder of the time it was used by Callan.

Most of the entities managed by ECI were set up in tax haven countries such as the Isle of Man. The bank accounts maintained by GJVP were kept in offshore accounts, principally at Bank Julius Baer (BJB) in Zurich, Switzerland. Other accounts were used at the Cyprus Popular Bank and at BJB in the Cayman Islands. This Court finds Callan moved the funds to foreign banks to make them difficult if not impossible to reach by creditors.

## III. IRS ENFORCEMENT ACTIONS

### A. The Closing Agreement

In the spring of 1991, the IRS began audits of Callan and later GDC and SWPH which focused on the large gain from the sale of Edgewater and Inwood. In June 1992, Callan's representatives submitted an offer in compromise to the IRS which asserted that the taxpayers were unable to pay the full tax liability. When Callan and GDC submitted their offer in compromise to pay less than the full amount of liability, the offer represented that payments would be funded in part from the sale of the FP & L Building which was owned by MREV IV, a second-tier subsidiary of GDC. Marc Grossberg, Joe Bond, Nelson Shields, David Rader, Michael Carlton, and Michael Hoffman, all representatives of Edward Callan and GDC from 1990 to 1992, repeatedly told the IRS that SWPH was owned by GDC. SWPH has always owned 100% of the stock in MREV IV. (GTX 115, GTX 88, GDC 7, 14).

Ultimately, on August 12, 1992, the IRS, Callan, and GDC entered into a closing agreement which provides for the gain to be taxed solely to GDC. Pursuant to the agreement, the corporate tax liability for the years 1988 and 1989 (not including interest and penalties) was:

1988—$18,100,677

1989—$ 1,534,233

The closing agreement resolved that the tax liability resulting from the gain from the property sale was the sole liability of the corporate tax payer, GDC. Specifically, the agreement recited:

> For the tax years 1987 and 1988, the Individual Taxpayer and his spouse shall have, for all purposes under the Code, no liability for taxes resulting from the 1987 sale of the Properties, nor from the transfer of the sales proceeds and rights under the installment sales agreements from the escrow to the Corporate Taxpayer in 1988, nor from interest income on the escrow account.

GDC 9, p. 2.

In addition, the closing agreement barred the parties from attacking by any means the validity of the agreement (*Id.* p. 4). The agreement allowed the matter only to be reopened "in the event of fraud, malfeasance, or misrepresentation." *Id.*

The IRS maintains it is not alleging fraud so as to reopen the closing agreement matters. Instead, the IRS urges that its actions are in furtherance of its rights under the closing agreement because, it argues GDC, the taxpayer, owns the FP & L Building. MREV IV, the IRS contends, holds title to the building as a mere nominee of GDC. Therefore, the taxes due by GDC may rightly be asserted against MREV IV and its asset.

### B. Liens and Levies

In January 1993, the IRS was contacted by informants who advised the IRS that Callan was refinancing the Florida Power & Light (FP & L) Building. Informants said Callan intended to transfer the proceeds from the refinancing to an offshore account and expatriate himself from the United States. The informants sent documents to the IRS which showed that an account had been set up in the name of the MREV IV in Switzerland at Bank Julius Baer. The documents reflect a commercial and refinancing value of the FP & L Building significantly higher than the value which had been represented to the IRS

---

22. In 1990, Callan created an encumbrance on the "Edgewater" by having Bank Julius Baer advance a several million dollar line of credit with the yacht as security. The purpose of the encumbrance was to prevent judgment creditors from reaching the asset.

in the proposed compromise by Mr. Shields, Callan's accountant.

Acting in part on the information received from the informants, on February 2, 1993, the IRS filed a notice of federal tax lien against the FP & L Building in Dade County, Florida. (GDC 38). The notice of federal tax lien states that it was filed against "Miami Real Estate Venture IV (Nominee of) Guyana Development Corporation." Also, on January 28, 1993, February 2, 1993, and February 18, 1993, the IRS served notices of levy on various accounts of debtor or entities which the IRS asserts were owned by the debtor through nominees. From late January to early February, 1993, the IRS filed levies on four bank accounts in the name of MREV IV "nominee of Guyana Development Corporation, 1415 Louisiana, 43rd Floor, Houston, Texas 77002." (GDC 103, 104, 105 and 106). Also, a writ of entry was served by the IRS on the offices of ECI on February 2, 1993. Debtor filed bankruptcy February 22, 1993.

The primary revenue officer in charge of the examination audits of GDC was Ms. Jeanie Kelm. Ms. Kelm completed the audits in the summer of 1991. Thereafter, Ms. Kelm continued with some involvement throughout the case. After the closing agreement was signed between the IRS, Callan, and GDC on August 17, 1992, the IRS renewed consideration of the offer in compromise. The offer in compromise is reviewed by the Collections Division of the IRS.

Once transferred to the Collections Division, the case was the responsibility of Ms. Patricia Booker. Ms. Booker met with Messrs. Grossberg and Shields, representatives of GDC and Edward Callan, to consider the offer in compromise in November, 1992. At that time, Ms. Booker testified she had serious reservations about the offer in compromise. An attempt was made to obtain a valuation of the FL & P Building. Messrs. Grossberg and Shields represented that the offer in compromise would be paid in part from the proceeds of sale of that building.

The Court finds Ms. Booker made no recommendation to accept the offer in compromise prior to the time that the informants began to call IRS Revenue Officer Jeanie Kelm in late January, 1993. Ms. Kelm took the informants' information to Ms. Booker. After numerous discussions with Ms. Kelm, Ms. Booker took the information to her superior, Mr. Carrillo. Thereafter, Ms. Booker conferred with District Counsel's Office of the IRS. District Counsel agreed that under the known facts of the case, Ms. Booker should seek nominee liens. Subsequently, the Assistant Head of the Collections Division, Ms. Mary Durgin, signed the nominee liens and levies. Ms. Booker and Mr. Carrillo took the liens and levies for a further review by District Counsel, Ms. Marilyn Ames. Ms. Ames approved formally the filing of the liens and levies.

## IV. LEGAL ANALYSIS

### A. Procedural Validity of Nominee Liens and Levies

■ The debtor, Callan, and MREV IV challenge the IRS liens and levies on the grounds that the nominee liens and levies are procedurally defective under the requirements of the Internal Revenue Manual and are, therefore, subject to invalidation. Specifically, GDC asserts that Mary Durgin, Assistant Chief of Collections and the officer who signed the nominee liens and levies, was required to personally, formally investigate whether the nominee liens and levies should be issued but failed to do so.

MREV IV and GDC contend that Mary Durgin failed to review the facts of the case and failed to acquaint herself with the Internal Revenue Manual requirements for the filing of a tax lien or levy based on a nominee theory. They contend that the IRS failed to take adequate precautions to insure that improper nominee liens were not filed.

The Internal Revenue Manual mandates the use of extreme caution by all Service personnel in the use of notices of lien and levy predicated on a nominee theory. The Internal Revenue Manual further provides that such action should not be initiated without written approval or confirmation from District Counsel in each case. Internal Revenue Manual § 5355.33. The Court finds that District Counsel properly approved the

nominee liens and levies as required by the Internal Revenue Manual, § 5355.33–.34.

Debtor, Callan, and MREV IV contend that the revenue officers failed to exercise caution in issuing the nominee liens and levies. The Court finds, however, that Ms. Booker made a procedurally correct decision to file the liens. As a revenue officer, Ms. Booker was authorized to make that decision. Ms. Durgin's reviewing Ms. Booker's decision and officially signing the forms herself merely adds another level of procedural safeguard. It does not undercut the procedural protections set out in the Internal Revenue Manual. The revenue officers believe that there exists a unity of interest between MREV IV and GDC so as to create nominee or alter ego status. Moreover, the IRS believes that Callan through MREV IV, usurped a corporate opportunity of GDC when title to the FP & L Building was taken in the name of MREV IV because GDC paid $6 million for the land on which it was built. This payment, the identity of interest, plus the informants' statements that Callan intended to refinance the building and send the proceeds to foreign banks justified the IRS lien on the FP & L Building and the levy on the MREV IV NationsBank account. The Court finds that the revenue officers complied with the requirements of the Internal Revenue Manual.

## B. Property of the Estate

Under 11 U.S.C. § 541, the bankruptcy estate is comprised of all legal or equitable interests of the debtor in property as of the commencement of the case. The bankruptcy estate of GDC includes stock of SWPH, MREV, and all subsidiaries of GJVP. However, the IRS contends that this Court should go further and uphold its liens by finding that the assets of Edward Callan, ECI, MREV IV, SWPH, and GJVP and its affiliates are property of the estate under the theories of alter ego or nominee.[23] MREV IV and Edward Callan assert that the levy on the FP & L Building was improper because MREV IV is not a nominee or alter ego of GDC.

As a general rule, property of the estate includes the debtor's stock in a subsidiary but not the assets of the subsidiary. *In re Beck Industries, Inc.,* 479 F.2d 410 (2nd Cir.1973) *cert. denied sub nom. Trustees of Beck Industries, Inc. v. Feldman,* 414 U.S. 858, 94 S.Ct. 163, 38 L.Ed.2d 108 (1973). However, where necessary to avoid fraud and ·injustice, bankruptcy courts recognize that the assets of subsidiaries should be subject to debts of creditors of the parent corporation. *In re Mid–West Metal Products, Inc.,* 13 B.R. 562 (Bankr.D.Kan.1981). Some of the various doctrines which courts have applied to disregard the corporate fiction are discussed below.

When legal title to property is held in the name of a third party for the benefit of the taxpayer, the courts consider that it is held in a nominal or representative capacity for the taxpayer. *United States v. Webb,* 595 F.2d 203 (4th Cir.1979). The property is made subject to the taxpayer's liability. *United States v. Miller Bros. Constr. Co.,* 505 F.2d 1031 (10th Cir.1974).

The Internal Revenue Manual suggests that the use of a nominee lien is appropriate where the taxpayer is paying maintenance expenses, using the property as collateral for loans and paying state and local taxes on the property. Internal Revenue Manual 5355.-33(2). In reaching the conclusion that an entity is the nominee of the taxpayer courts frequently view the relationship between the entities under a state law alter ego analysis. *See e.g. In re Brickell Invest. Corp.,* 85 B.R. 164 (Bankr.S.D.Fla.1988).[24]

Alter ego applies where there is such a unity of interest between corporation and

---

**23.** In the case of the motion for relief from stay against the residence of Edward Callan, no pre-petition liens were filed. Instead, the United States seeks leave to lift stay and proceed versus the residence by filing a lien and later by foreclosure.

**24.** In addition to its offensive use by the IRS, the nominee theory is frequently urged by the taxpayer under an agency/principal analysis to defend the failure to pay taxes by the nominee entity or the use by the taxpayer of tax attributes otherwise belonging to the nominee entity. *See eg. Moncrief v. United States,* 730 F.2d 276 (5th Cir.1984).

individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice. *Castleberry v. Branscum,* 721 S.W.2d 270 (Tex. 1986) *reh'g overruled* (Tex.1987). Thus, the two requirements for the application of the alter ego doctrine are (1) that there be such unity of interest and ownership such that the separate personalities of the corporation and its owner no longer exist, and (2) if the acts are treated as those of the corporation alone, an inequitable result will follow.

"The burden of proving an alter ego relationship rests squarely on the shoulders of the party seeking to disregard the corporate entity." *In re Sims,* 994 F.2d 210, 217 (5th Cir.1993) (citing *In re Multiponics, Inc.,* 622 F.2d 709, 723 (5th Cir.1980)). Since the corporations involved are incorporated in various states and countries and the Florida Power & Light Building is located in Florida, this Court must first decide what law applies to the determination of alter ego.

## C. Choice of Law

■ The court in *In re Consolidated Capital Equities Corp.,* 143 B.R. 80 (Bankr. N.D.Tex.1992), determined that while courts apply two different choice-of-law tests, the "forum" test used by a federal district court sitting in diversity cases, which, in Texas, would be the "most significant relationship" test,[25] or, the "independent judgment" test,[26]

the federal test applied by bankruptcy courts, the tests are substantially similar so that under either test the court must apply the law of that state with the most significant relationship to the transaction at issue. 143 B.R. at 85. The *Consolidated Capital* court notes that the Fifth Circuit has not decided which rule its constituent bankruptcy courts should apply. 143 B.R. at 85.

The court in *In re Chanel Financial, Inc.,* 102 B.R. 549 (Bankr.N.D.Tex.1988) determined that in selecting which state's substantive law applies to the imposition of a constructive trust, an equitable remedy, as is the determination of alter ego, the court must follow the choice of law principles of the forum state. The *Chanel* court determined that the general conflict of laws rule in Texas is that "questions of substantive law are controlled by the laws of the state where the cause of action arose, but matters of remedy and of procedure are governed by the laws of the state where the action is sought to be maintained." 102 B.R. at 550 (citations omitted).[27]

Under these tests, this Court applies the most significant relationship analysis to determine substantive issues and Texas law to matters of remedy. This Court determines that Texas is the state with the most significant relationship to the transactions and corporations at issue and its law shall be used

**25.** Whether in contract or in tort, Texas law applies the most significant relationship test given in Restatement (Second) of Conflicts of Law @ 6 (1971): (1) a court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law; (2) when there is no such directive, the factors relevant to the choice of the applicable rule of law include, (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied. *Teichler v. DSC Communications Corp.,* 1988 WL 157305, 6 n. 11, 1988 U.S.Dist. LEXIS 16448, 19 n. 11 (D.N.D.Tex.1988).

**26.** The independent judgment test is a multifactor, contacts analysis similar to that applied in Texas courts. 143 B.R. at 85.

**27.** *See also United States v. Clinical Leasing Serv., Inc.,* 982 F.2d 900 (5th Cir.1992) in deciding which state's law to use for purposes of determining alter ego, Fifth Circuit chose Louisiana law rather than Delaware law, the state of incorporation, citing to Restatement (Second) Conflicts of Laws @ 306 (1971) ("The obligations owed by a majority shareholder to the corporation ... will be determined by the local law of the state of incorporation, except ... where, with respect to the particular issue, some other state has a more significant relationship ...") *In re Blanton,* 105 B.R. 811 (Bankr.W.D.Tex.1989) determination of whether the corporate veil should be pierced is a determination of the property attributes of stock ownership and of the relationship between a stockholder/director and his corporation. Such determinations are made by application of state, not federal law. (citing *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)).

for purposes of determining whether movant has proven alter ego.

## D. Alter Ego

■ Texas law provides three broad theories under which a court may disregard the corporate fiction and pierce the corporate veil. The corporate veil may be pierced "when: 1) the corporation is the alter ego of its owners or shareholders, 2) the corporation is used for illegal purposes, and 3) the corporation is used as a sham to perpetrate a fraud." *Villar v. Crowley Maritime Corp.*, 990 F.2d 1489, 1496 (5th Cir.1993), *reh'g, en banc, denied,* 997 F.2d 883 (5th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 690, 126 L.Ed.2d 658 (1994). The seminal case on alter ego in Texas is *Castleberry v. Branscum,* 721 S.W.2d 270 (Tex.1986), *reh'g overruled,* (Tex.1987).[28] The Texas Supreme Court in *Castleberry* stated:

28. Although the case was partially overruled by Tex.Bus.Corp.Act Ann. art. 2.21 (Vernon Supp. 1993) as to contractual obligations of a domestic corporation, it has continuing validity regarding piercing the corporate veil for tort and statutory obligations of a corporation. Further, the statute has no applicability to corporations which were not incorporated under its provisions, such as GDC, MREV IV, or AMI. *See Mancorp. Inc. v. Culpepper,* 802 S.W.2d 226, 227 (Tex.1990), on remand, remanded 836 S.W.2d 844 (Tex.App.Houston—1st Dist.1992). Although the court in *Villar* footnotes that *Castleberry* "was legislatively overruled," this footnote 8 is undoubtedly unintended dicta since the Fifth Circuit correctly cites the corporate disregard analysis of *Fidelity & Deposit Co. v. Commercial Casualty Consultants, Inc.,* 976 F.2d 272 (5th Cir. 1992). The *Fidelity* decision accurately relies on the *Castleberry* factors in analyzing imposition of alter ego for the tort involved in that case and notes that *Castleberry* has been superseded "on other grounds." The *Castleberry* court lists specific grounds for disregard of the corporate fiction even though corporate formalities have been observed and corporate and individual property have been kept separately, when the corporate form has been used as part of a basically unfair device to achieve an inequitable result. Those grounds are (1) when the fiction is used as a means of perpetrating fraud; (2) where a corporation is organized and operated as a mere tool or business conduit of another corporation; (3) where the corporate fiction is resorted to as a means of evading an existing legal obligation; (4) where the corporate fiction is employed to achieve or perpetrate monopoly; (5) where the corporate fiction is used to circumvent a statute;

[Alter ego] is shown from the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes. 721 S.W.2d at 272 (citations omitted).[29]

■ In analyzing the *Castleberry* opinion, the Fifth Circuit in *Pan Eastern Exploration Co. v. Hufo Oils,* 855 F.2d 1106 (5th Cir.1988) stated:

One strand [of piercing the corporate veil] we may call "alter ego" proper.... The phrase "alter ego" has often been (and still is) used as a generic term for corporate disregard or "veil-piercing," but the *Castleberry* opinion makes clear that "alter ego" is a particular kind of rationale for

and (6) where the corporate fiction is relied upon as a protection of crime or to justify wrong. *Castleberry,* 721 S.W.2d at 272.

29. The Court notes that the Fifth Circuit has determined that the federal and Texas alter ego doctrines while perhaps not equivalent in all respects, do overlap. *United States v. Jon–T Chemicals Inc.,* 768 F.2d 686, 689 n. 6 (5th Cir.1985) *cert. denied,* sub nom. *Jon–T Chemicals v. United States,* 475 U.S. 1014, 106 S.Ct. 1194, 89 L.Ed.2d 309 (1986). In *Jon–T* the Fifth Circuit analyzed various factors in determining whether a subsidiary is the alter ego of its parent, the Fifth Circuit looks at various factors: whether (1) the parent and the subsidiary have common stock ownership; (2) the parent and the subsidiary have common directors or officers; (3) the parent and subsidiary have common business departments; (4) the parent and the subsidiary file consolidated financial statements and tax returns; (5) the parent finances the subsidiary; (6) the parent caused the incorporation of the subsidiary; (7) the subsidiary operates with grossly inadequate capital; (8) the parent pays the salaries and other expenses of the subsidiary; (9) the subsidiary receives no business except that given to it by the parent; (10) the parent uses the subsidiary's property as its own; (11) the daily operations of the two corporations are not kept separate; and (12) the subsidiary does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings. 768 F.2d at 691–692. The *Jon–T* court emphasizes consideration of the totality of the circumstances and that there is "no litmus test." 768 F.2d at 694.

corporate disregard. The focus of alter ego proper is on the legal adequacy of the corporation's existence, and the relationship between the corporation and its controlling corporation or individual.... The problem arises when a corporation is not treated as legally distinct, when, in other words, the owners neglect to maintain the formal existence of the corporation as required by law. "Alter ego's rationale is: 'if the shareholders themselves disregard the separation of the corporate enterprise, the law will also disregard it so far as necessary to protect individual and corporate creditors.'"

... [O]ur present purpose is to isolate analytically the strands of the doctrine, and there is nothing in the alter ego strand to suggest that anything more is required than the failure of the owners to maintain the corporation as a distinct legal entity. The focus of alter ego proper is on the relation between the corporation and its owners and not on the relation between the corporation and the claimant.

*Pan Eastern,* 855 F.2d at 1131–1132 (footnote and citations omitted).[30] *Castleberry* makes clear that the type of inequity or injustice which will warrant piercing the corporate·veil is much broader than those cases speaking strictly of fraud. *In re Blanton,* 105 B.R. 811 (Bankr.W.D.Tex.1989).[31] The *Castleberry* totality-of-the-circumstances approach is most appropriate here because in addition to traditional piercing of the corporate veil, which holds the shareholder liable

for the debts of the corporation, the United States and the trustee urge "reverse piercing". to downstream the liabilities of the shareholders to the subsidiaries. *See e.g. Zahra Spiritual Trust v. United States,* 910 F.2d 240, 245–246 (5th Cir.1990). Thus, the trustee and United States urge (1) that the subsidiaries are the alter ego of the parent, GDC, and (2) the parent, is the alter ego of Edward Callan, the 100% preferred stockholder.

The Fifth Circuit has determined that direct stock ownership is not required to support a finding of alter ego when control is otherwise established. *Century Hotels v. United States,* 952 F.2d 107, 110 (5th Cir. 1992). *See also Zahra Spiritual Trust v. United States,* 910 F.2d 240 (5th Cir.1990) (Fifth Circuit applying Texas law remanded case on issue of whether interest in a trust that owned shares of stock in corporation equated with stock ownership by alter ego). *But see Permian Petroleum Co. v. Petroleos Mexicanos,* 934 F.2d 635 (5th Cir.1991), *reh'g denied,* 1991 U.S.App. LEXIS 18457 (5th Cir.1991), (Texas courts will not apply the alter ego doctrine to directly or reversely pierce the corporate veil unless one of the "alter egos" owns stock in the other).

The stock ownership of all entities is interrelated with the exception of any equity interest in SWPH owned by Debbie Callan. GDC is the only partner entitled to any GJVP proceeds on liquidation. GDC owns 100% of the shares of AMI. Edward Callan owns 100% of the preferred stock of GDC.

**30.** *cf. Fidelity & Deposit Co. v. Commercial Casualty Consultants, Inc.,* 976 F.2d 272 (5th Cir. 1992) (Under theory of sham to perpetuate a fraud, claimant must show reliance on individuals' credit to prevail on corporate disregard theory).

**31.** *cf.* Florida law requires fraud or improper purpose to justify piercing the corporate veil. *Dania Jai–Alai Palace, Inc. v. Sykes,* 450 So.2d 1114 (Fla.1984) (showing that wholly-owned subsidiaries were mere instrumentalities of parent corporation without establishing illegal, fraudulent, or unjust purpose on the part of the parent corporation was insufficient to pierce the corporate veil). *But see In re F & C Services, Inc.,* 44 B.R. 863, 868 (Bankr.S.D.Fla.1984) (actual fraud need not be perpetrated upon the creditors, corporate entity will be disregarded in order to prevent injustice to·creditors). *See also Hussain*

*v. Side,* 592 So.2d 1106, 1991 Fla.App. LEXIS 9146 (Fla.Dist.Ct.App. 3rd Dist.1991) (to pierce the corporate veil under the alter ego doctrine plaintiff must show that the corporation was formed for·an improper purpose and was being used as a mere instrumentality).

Delaware law depends on fraud in piercing the corporate veil. *In re Sims,* 994 F.2d 210, 217 (5th Cir.1993) (Delaware requires "fraud or something like it."); *Mabon, Nugent & Co. v. Texas American Energy Corp.,* 1990 WL 44267, 5, 1990 Del.Ch. LEXIS 46, 14 (Del.Ch.1990) (Generally, the corporate veil may be pierced where there is fraud.); *Harco National Insurance Co. v. Green Farms, Inc.,* 1989 WL 110537, 4, 1989 Del.Ch. LEXIS 114, 10 (Court of Chancery of Delaware, 1989) (Delaware courts have not explicitly adopted the alter ego theory of piercing the corporate veil.).

GDC owns at least one-half of the stock in SWPH; SWPH owns 100% of MREV IV.

### E. Standing of IRS

 As a creditor, the IRS has no standing to allege an alter ego theory. *In re S.I. Acquisition, Inc.,* 817 F.2d 1142 (5th Cir. 1987) (claim for alter ego is property of the bankruptcy estate.) This Court noted in *In re McConnell,* 122 B.R. 41 (Bankr.S.D.Tex. 1989):

> Although it is inferable that individual creditors can also act in lieu of the trustee or debtor-in-possession, extraordinary circumstances must be present before the court will allow them standing to bring these types of suits. The conditions necessary for the right to do so include the following: (1) that the claim must be colorable; (2) that the intervention must be brought on behalf of the estate; and (3) that the trustee or debtor-in-possession has unjustifiably refused to bring the suit or abused its discretion in not suing.
>
> ... [P]laintiff, by attempting to assert the Trustee's causes of action, is concerned with improving its own status as a secured creditor, not with recovering assets for the benefit of all creditors. Further, the Trustee has not unjustifiably refused to bring the suit and has not abused his discretion in not suing.

*Id.* at 44 (citations omitted).

 The trustee alone may assert an alter ego claim on behalf of the estate absent further court order. The trustee in this case alleges that SWPH and AMI are subsidiaries of debtor GDC which have not maintained genuinely distinct corporate identities. GDC/GJVP funds have repeatedly been used to fund the operations of both entities without proper repayment to GDC.

The trustee contends that GJVP should merely be liquidated pursuant to the terms of the GJVP partnership agreement by placing the trustee on behalf of GDC in charge as liquidating partner.[32] The trustee also alleges alter ego between Edward Callan, ECI, and GDC. Consequently, any right claimed

by Callan to the assets belongs in fact to GDC.

At this time, the trustee does not request that the GJVP affiliates' assets, including the oil and gas concessions, be merged under an alter ego theory into GDC, for numerous business and legal reasons. Similarly, the trustee does not argue that MREV IV is an alter ego of GDC for business and legal reasons. Instead, the trustee asserts that GDC owns alternatively, all of SWPH (and thereby MREV IV) as an alter ego or at least 50% of SWPH and thereby 50% of MREV IV.

 Likewise, the United States lacks standing to assert the allegation that Callan usurped a corporate opportunity by diverting GDC and GJVP funds to MREV IV and the construction of the FP & L Building. Usurpation of a corporate opportunity is a matter rightly asserted by the trustee on behalf of the debtor. *Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233 (5th Cir.1988), *reh'g denied, en banc,* 864 F.2d 1147 (5th Cir.1989).

### F. Closing Agreement

 The Internal Revenue Code provides that the Secretary may enter into an agreement in writing with any person relating to the liability of such person in respect of any internal revenue tax for any taxable period. 26 U.S.C.A. § 7121(a). This document is known as a closing agreement. If the agreement is approved by the Secretary, it is final and conclusive and shall not be reopened as to the matters agreed upon, and shall not be set aside or disregarded in any proceeding, except upon a showing of fraud or malfeasance, or misrepresentation of a material fact. 26 U.S.C.A. § 7121(b).

The court in *Wolverine Petroleum Corp. v. Commissioner,* 75 F.2d 593 (8th Cir.1935), *cert. denied,* 295 U.S. 743, 55 S.Ct. 656, 79 L.Ed. 1689 (1935), describes the purpose and effect of a closing agreement as follows:

> The purpose of the statute authorizing closing agreements is to enable the taxpayer and the government finally and completely to settle all controversies in respect

---

**32.** This Court has previously so ordered.

of the tax liability for any previous taxable period, and to protect the taxpayer against the reopening of the matter at a later date, and to prevent the filing of additional claims for refund or the institution of suit for the same purpose by the taxpayer.

. . . .

Full consideration dictates that matters affecting the taxpayer's liability once concluded by a closing agreement should be respected in every particular, and subject to attack only upon the grounds enumerated in the statute.

75 F.2d at 594–595 (citations omitted).

■ Edward Callan has unity of interest with MREV IV and has made false representations (including testimony in Court) pertaining to the ownership of SWPH stock. However, the United States does not seek to repudiate the closing agreement on that or any other basis. Consequently, the United States is bound by the closing agreement and estopped from asserting a nominee lien versus Callan.

The United States asserts that it is not estopped by the closing agreement because a closing agreement does not control collection rights of the IRS. The reasoning of the United States is that while it agreed to forego payment from Edward Callan and any of his alter egos, the liens and levies were attachments on alter egos of GDC. The trustee asserts no alter ego between GDC and MREV IV; conversely, the United States argues for alter ego in order to justify the prepetition liens and levies against MREV IV property. The Court finds MREV IV is at least a partially-owned corporation of SWPH and thereby of GDC, but there is little other ongoing interaction between the two corporations. MREV IV has a distinct identity from GDC. Stock ownership by GDC of SWPH, the MREV IV parent, does not create alter ego status between GDC and MREV IV.

At the time of filing of the liens and levies the IRS knew only that GDC owned all or part of SWPH stock, and Callan used GDC money to buy the land for the FP & L Building. It had little other information to link GDC with MREV IV. The Court finds that the United States imposed the liens and levies based on the alter ego status it thought GDC, GEL, and MREV IV had with Edward Callan. The closing agreement bars that recourse. The United States does not contend that there was fraud, malfeasance, or the misrepresentation of a material fact in entering into the closing agreement. The Court concludes that the agreement cannot be set aside and that the United States is bound by its terms. The Court finds that since the IRS is bound by the closing agreement and post-petition, the IRS has no standing to pursue whether any entity is the alter ego of debtor.

■ Debtor, Callan, ECI, and MREV IV contend that the trustee is bound by the terms of the closing agreement as well and may not reach any assets of Edward Callan or ECI to satisfy the IRS tax liability of GDC. However, the Court finds that the trustee is not bound by the terms of the agreement due to his strong arm powers under 11 U.S.C. §§ 546 and 548. He may formally seek to exercise those powers in later proceedings. However, at issue now is merely whether the trustee may resist the claims of Callan and MREV IV in the matters presently before the Court.

Bankruptcy Code section 548, entitled "Fraudulent Transfers and Obligations," provides that the trustee may avoid any obligation of the debtor incurred within one year before the bankruptcy filing if: (1) the trustee shows fraud or (2) the debtor received less than reasonably equivalent value in exchange for such transfer or obligation and became insolvent as a result of such transfer. The record reflects numerous unsecured creditors in existence at the time the closing agreement was executed and there is no evidence they were ever paid. (GTX 2, 3, 5, and 88). GDC received no consideration for undertaking the tax debt of Edward Callan and entering into the closing agreement. The closing agreement was entered into within one year prior to this bankruptcy. At the time of the closing agreement Callan's original capital contribution of $53 million was substantially dissipated in his various ventures. GDC already was or became insolvent as a result of undertaking Callan's tax burden. The Court

concludes that the trustee is not estopped by the closing agreement from asserting alter ego status of assets held in Callan's name under 11 U.S.C. § 548(a)(1).

Similarly, the provisions of 11 U.S.C. § 548(a)(2)(A) and (B) permit trustee standing and avoid allegations of estoppel due to the closing agreement. At the time of the closing agreement, Callan arguably had no intent to permit GDC to pay the full tax liability to the IRS. Callan's intent was to liquidate GDC assets quickly, transfer the assets offshore, and avoid payment of the IRS and other creditors. Consequently, the Court finds that the trustee is not estopped by the closing agreement from asserting alter ego against the assets of Edward Callan and ECI.[33]

## V. CONCLUSIONS

Property of the bankruptcy estate consists of all legal or equitable interests of the debtor as of the commencement of the case. 11 U.S.C. § 541. The Court finds that SWPH, Edward Callan, ECI, and AMI entities are the alter egos of debtor. The Court **ORDERS** their property frozen until the trustee can take whatever actions are necessary to preserve the estate. No transfers, no other disposition, and no dissipation of the assets is to occur. The trustee is **ORDERED** to file schedules detailing the assets and debts of these entities by June 15, 1994. *In re Mac-Donald*, 114 B.R. 326 (D.Mass.1990) (Under federal bankruptcy law, any property of the debtor's estate which "the trustee may use, sell, or lease" pursuant to 11 U.S.C. § 363 must be turned over to the trustee by any entity "in possession, custody, or control" of such "all legal or equitable interests of the debtor in property as of the commencement of the case."); *In re Moran Pipe & Supply Co., Inc.*, 130 B.R. 588 (Bankr.E.D.Okla. 1991); *In re Sklarin*, 69 B.R. 949, 954 (Bankr.S.D.Fla.1987) (" 'It is well established that property of the Debtor in the possession, custody, and control of its alter ego comprises property of the estate at the commencement of the case,' and that bankruptcy courts have the power to disregard separate corporate entities so as to reach the assets of its non-debtor alter ego to satisfy debts of the Debtor.")

The trustee on behalf of debtor is the liquidating partner of GJVP. The Court finds that GJVP is identical to GDC. Moreover, because of the absence of Eldorado contribution to the joint venture, even if they were not alter egos, GDC is the only partner entitled to distribution.

The United States' motions for relief from stay against property held in the name of Edward Callan, MREV IV, and GEL are **DENIED.** The United States' liens are invalid as to MREV IV and GEL. Lift stay is improper as to the penthouse because the trustee now has charge of the assets. The interpleader is resolved in favor of the trustee.

**33.** The trustee has not moved to compel the United States to turn over assets held pursuant to the closing agreement. That issue remains for another day.