**In re CATFISH ANTITRUST LITIGATION.**

**This Document Relates To "All Actions".**

Master No. 2:92cv73–D–O.
MDL 928.

United States District Court,
N.D. Mississippi,
Delta Division.

Nov. 17, 1995.

Richard A. Lockridge, Schatz Paquin Lockridge, Grindal & Holstein, Minneapolis, Minnesota, Edward A. Moss, Holcomb, Dunbar, Connell, Chaffin & Willard, Oxford, Mississippi, for plaintiff.

Stephen Lee Thomas, Greenville, Mississippi, for defendants.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

Presently before the court are motions of the defendants ConAgra, Country Skillet, Delta Pride, Hormel and Farm Fresh for the entry of summary judgment on their behalf. Pursuant to this opinion, the court shall hold in abeyance a portion of the motions and shall deny the remainder.

## BACKGROUND [1]

### I. THE CATFISH PRICE–FIXING CONSPIRACY

#### A. PROLOGUE

The named plaintiffs in this litigation are food distributors who purchased catfish and catfish products from 1981 until 1990, from various companies that were engaged in the business of processing and selling farm raised catfish and catfish products. The plaintiffs invoke section 4 of the Clayton Act (15 U.S.C. § 15) as a means to recover treble damages, costs of suit, and attorneys' fees for the defendants' alleged violations of section 1 of the Sherman Act. The sum and substance of the plaintiffs' consolidated complaint is that the defendants have engaged in a combination and conspiracy, since at least 1981 through 1990, to suppress and eliminate competition in the catfish industry by fixing prices of catfish and catfish products sold throughout the United States. It is alleged that the defendants agreed to establish minimum prices for catfish and certain catfish products and to adhere to the established minimum prices. As a consequence, plaintiffs allege injury in that the prices paid for catfish were artificially high and at non-competitive levels.

The factual background surrounding this litigation is, to say the least, colossal. The undersigned does not have adequate time to restate the entire history of this controversy for the purposes of the motions at bar. Thankfully, such is not necessary, and the court will strive for brevity when possible. Only so much of the facts as are required for this court's ruling will be mentioned today as necessary. It will be beneficial, however, for the court to first briefly mention the various persons and entities involved in this matter.

### B. THE PLAYERS—DEFENDANTS AND THEIR AGENTS/EMPLOYEES

The catfish industry is interwoven in many respects, and as is the case of many industries, many of the persons involved have worked for more than one of the defendants during the time of the charged conspiracy. This recitation of names and dates will be important in determining what evidence of conspiratorial activity can be attributed to the various defendants.

#### a. DELTA PRIDE CATFISH, INC.

Representatives for Delta Pride (DP) include Samuel Hinote (1980–90), Larry Joiner (1984–93), William Dauler (1982–1988), Harry T. McNamee (1988–present), Lee Stovall (1988–present), Michael L. Brown (1988–present), Kimberly Stewart Cox (1983–88), Robert Meyer (1988–89), Ken Crawford (1984–present), John "Buddy" Moses (1986–90), and Walter "Smitty" Reeves (1983–88).

#### b. CONAGRA, INC. and COUNTRY SKILLET CATFISH COMPANY [2]

Representatives for ConAgra (CA) include Samuel Hinote (1967–80), Paul C. Barrett (1976–80), Joseph T. Glover, Sr. (1968), Henry Williams (1973–75) and Harry T. McNamee, Jr. (1982). Representatives for Country Skillet include Richard D. "Dickie" Stevens (1986–91), John Hammond (1983–85), John Tallent (1986), E.W. "Pete" Ellis (1981–86), William Dauler (1977–81; 1990–present), Michael L. Brown (1984–88), and Michael Mauney (1981–83; 1987–90).

#### c. HORMEL FOODS CORPORATION

Representatives for Hormel Foods (HF) include Joseph T. Glover, Sr. (1983–87), James Rieth (1963–present), James Hoffman (1975–present), William Hunter, Mark Englehardt (1981–present), James Cole (1959–

---

1. In ruling on a motion for summary judgment, this court is not to make credibility determinations, weigh evidence, or draw from the facts legitimate inferences for the movant(s). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). Rather, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255; 106 S.Ct. at 2513–14. The facts, as relied upon by the court in this opinion, are so presented.

2. Before 1991, ConAgra operated Country Skillet as a division of its business. In 1991, Country Skillet Co. was incorporated as a wholly-owned subsidiary of ConAgra, Inc.

1983; 1986–present), James Collins, and William McCormack (1973–86).

### d. FARM FRESH CATFISH COMPANY

Representatives for Farm Fresh (FFC) include Everett J. "Jack" Perkins (1976–83), Joseph T. Glover, Sr. (1970–87), Don Haynie (1985–present), Joseph T. Glover, Jr. (1972–75), Thomas A. Rhodes (1981–85), Thomas R. "Randy" Rhodes (1984–85), Larry Joiner (1979–84), Harry T. McNamee, Jr. (1985), Lee Stovall (1985–88), James Rieth (1984–86), James Hoffman (1984–86), William Hunter, Mark Englehardt (1985–88), James Cole (1986–88), James Collins (1988–91), Kimberly Stewart Cox (1979–83), Ken Crawford (1977–84), Walter "Smitty" Reeves (1979–83), and Michael Mauney (1983–84).

### e. SIMMONS FARM RAISED CATFISH, INC.

The representative for Simmons Farm Raised Catfish (SC) is its founder Harry D. Simmons, Jr. (1982–present).

### f. FRESHWATER FARMS, INC.

The representative for Freshwater Farms (FFs) is Henry Williams (1986–present).

### g. SOUTHERN PRIDE CATFISH CO., INC.

Representatives of Southern Pride (SP) include Joseph T. Glover, Jr. (1986–present), Thomas A. Rhodes (1985–91) and Thomas R. "Randy" Rhodes (1986–present).

### h. MAGNOLIA PROCESSING, INC.

The representative for Magnolia Processing (MP) is its founder William Gidden (1983–present).

The parties have included more detailed information concerning these individuals which is not required to be set forth again here. If further information becomes necessary, it will be set out by the court.

## DISCUSSION

### II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as

a matter of law." F.R.C.P. 56(c). The party seeking summary judgment carries the burden of demonstrating that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once a properly supported motion for summary judgment is presented, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Brothers v. Klevenhagen*, 28 F.3d 452, 455 (5th Cir.1994). "Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Federal Sav. & Loan Ins. v. Krajl*, 968 F.2d 500, 503 (5th Cir.1992). The facts are reviewed drawing all reasonable inferences in favor of the party opposing the motion. *Matagorda County v. Russell Law*, 19 F.3d 215, 217 (5th Cir.1994); *King v. Chide*, 974 F.2d 653, 656 (5th Cir.1992).

### III. THE PLAINTIFFS' CLAYTON ACT CLAIM

### A. THE LEGAL STANDARD

The plaintiffs' primary claim is that "the defendants and their co-conspirators entered into and engaged in a combination, and conspiracy to suppress and eliminate competition by fixing prices of catfish and catfish products directly sold throughout the United States." Plaintiffs' Fifth Amended Complaint, ¶ 30. Section 4(a) of the Clayton Act provides that:

> [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any District Court of the United States ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee....

15 U.S.C. § 15(a) (Supp.1995). In order for a plaintiff to recover compensatory damages, "[p]rivate antitrust liability ... requires the

showing of (1) a violation of the antitrust laws, (2) the fact of damage, and (3) some indication of the amount of damage." *In re Corrugated Container Antitrust Litigation*, 756 F.2d 411, 416 (5th Cir.1985) (quoting *Nichols v. Mobile Bd. of Realtors*, 675 F.2d 671, 675–76 (5th Cir.1982)). The alleged antitrust violation involved in the case at bar is one in which the plaintiffs charge that the defendants conspired to fix prices of catfish products in violation of the Sherman Act, 15 U.S.C. § 1.[3] Therefore, in order to establish liability under the Clayton Act, the plaintiffs must prove the existence of a conspiracy to fix prices and that "the conspiracy in fact affected the prices paid," operating as a restraint of trade.[4] *Corrugated Container*, 756 F.2d at 416.

## B. THE EVIDENCE

The plaintiffs' proof of the creation and furtherance of this conspiracy falls into different categories, but face-to-face meetings and telephone conversations are the real substance of the evidence in this regard. The face-to-face meetings appear to be the most probative, but the telephone conversations are not without evidentiary worth.

### 1. TELEPHONE CONTACT

The plaintiffs have presented a voluminous record of telephone calls and facsimile transmissions between the various defendants from early in 1981 through the summer of 1995. A vast number of these contacts occurred during the existence of the alleged conspiracy. While the plaintiffs cannot always provide specific details concerning the calls, the evidence of such communications can be nonetheless telling. At the least, the sheer number of contacts between competitors, when considered with all of the other available evidence, is circumstantial evidence of the existence of a conspiracy such as the one charged. In addition, a number of the calls coincide temporally with other evidence which lends probative weight to such an inference.

### 2. THE MEETINGS

The most direct evidence of conspiratorial acts stems from meetings held by representatives of the various defendants. Many of these meetings can be summarized as follows:

## CATFISH PRICE FIXING MEETINGS

| WHERE? | WHEN? | WHICH △'S WERE REPRESENTED? | WHAT WAS DECIDED? |
| --- | --- | --- | --- |
| Ramada Inn I (Jackson, MS) | 1978 | Country Skillet, Farm Fresh | Agreement to set minimum prices |
| Sun & Sand Motel (Jackson, MS) | Late 70's and early 80's | Country Skillet, Farm Fresh, Delta Pride, Simmons, Magnolia | Prices discussed and agreed upon |

3. Section one of the Sherman Act provides that: Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. 15 U.S.C. § 1.

4. Not all restraints of trade violate the Sherman Act. Normally, a restraint of trade sufficient to establish a violation under the Sherman Act must be proven to be an unreasonable one, and this "rule of reason" provides a classic question for the trier of fact. *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 986 (5th Cir.1983). "The factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Business Elec. v. Sharp Elec.*, 485 U.S. 717, 723, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808, 816 (1988) (quoting *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977)).

Some violations, however, are so damaging to a system of free and open competition and so devoid of legitimate business purpose that courts have labeled them per se violations not subject to the rule of reason. [cites omitted] These per se claims [include] price fixing and horizontal exclusions from the marketplace....

*Multiflex*, 709 F.2d at 987. Price fixing is a per se violation of the Sherman Act, and as that is the claim involved in this case, the rule of reason is inapplicable. *United States v. MMR Corp.*, 907 F.2d 489, 497 (5th Cir.1990); *Todorov v. DCH Healthcare Authority*, 921 F.2d 1438 (11th Cir.1991).

| WHERE? | WHEN? | WHICH Δ'S WERE REPRESENTED? | WHAT WAS DECIDED? |
| --- | --- | --- | --- |
| Ramada Inn II (Greenville, MS) | 1982 | Country Skillet, Delta Pride, Farm Fresh | Pricing agreement reached |
| Fishland Boardroom | 1982 or 1983 | Delta Pride, Country Skillet, Farm Fresh, Simmons | Pricing agreements reached |
| Reed Farm Office I | 1983 | Farm Fresh, Delta Pride, Simmons, Country Skillet and ConAgra (by proxy) | Agreement to raise prices nationwide on a certain date |
| Reed Farm Office II | 1983 | Farm Fresh, Delta Pride, Simmons, Country Skillet and ConAgra (by proxy) | Enforcement for Reed Farm Office I meeting |
| Ramada Inn III— The Church's Fried Chicken Meeting (Greenville, MS) | 1984–85 | Delta Pride, Farm Fresh, Simmons, Country Skillet (by proxy) | Agreement to raise prices on a certain date |
| Widgen Wallow Duck Club I (Indianola, MS) | 1984–85 | Farm Fresh, Delta Pride, Simmons, ConAgra (by proxy) | Agreement to set minimum prices on a certain date on various products |
| Widgen Wallow Duck Club Il (Indianola, MS) | 1984–85 | Farm Fresh, Delta Pride, Simmons, Country Skillet | Follow-up meeting for Duck Club I; discussion of implementation |
| Catfish Farmers of America Meeting (Sandestin, FL) | 1990 | Country Skillet, Delta Pride | Agreement to raise prices in the Chicago market |

The court will save for later in this opinion any more detailed discussion of the supporting evidence as it pertains to each defendant and their involvement in the conspiracy alleged by the plaintiffs.

## IV. CONAGRA AND COUNTRY SKILLET'S MOTION FOR SUMMARY JUDGMENT

### A. EVIDENCE OF CONSPIRACY INVOLVEMENT

■ The first complaint was filed in this action on February 7, 1992. Strictly applying the Clayton Act's four-year limitations period results in the conclusion that recovery for claims accruing before February of 1988 should be barred[5]. However, the analysis is not as simple as it may seem.

### 1. FRAUDULENT CONCEALMENT

■ This court has already addressed the issue of fraudulent concealment as tolling the Clayton Act's statute of limitations, but only insofar as determining whether the plaintiffs'

---

5. Even under a theory of a "continuing violation" of the antitrust laws such as the plaintiffs are essentially arguing in this case, "continuing conduct within the limitations period which merely furthers the initial antitrust violation does not prevent the running of the statute of limitations." *United Farmers Agents v. Farmers Ins. Exch.*, 892 F.Supp. 890, 912 (W.D.Tex.1995); *see Al George, Inc. v. Envirotech Corp.*, 939 F.2d 1271, 1275 (5th Cir.1991). Instead, an antitrust suit "must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action." *United Farmers*, 892 F.Supp. at 912 (citing *TCA Building Co. v. Northwestern Resources*, 861 F.Supp. 1366, 1377–78 (S.D.Tex.1994)); *see Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971) ("In the context of a conspiracy to violate the antitrust laws ... this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants ... a cause of action ac-

pleadings were sufficient to maintain the argument. *In re Catfish Antitrust Litigation,* 826 F.Supp. 1019, 1030–33 (N.D.Miss.1993) (denying defendants' motions to dismiss). Today the undersigned returns to the topic to determine if there is a genuine issue of material fact on the matter.

■ As this court noted:

The doctrine of fraudulent concealment contains two elements which a plaintiff must prove. First, the defendant concealed the conduct complained of; and, second, despite the exercise of due diligence, plaintiff failed to discover the facts that form the basis of his claim. *State of Texas v. Allan Construction Co. Inc.,* 851 F.2d 1526, 1528 (5th Cir.1988); *Jensen v. Snellings,* 841 F.2d 600, 607 (5th Cir.1988); *In re Beef Industry Antitrust Litig.,* 600 F.2d 1148, 1169 (5th Cir.1979). It is generally recognized that the statute of limitations is tolled only if the defendant has engaged in affirmative acts of concealment. *Allan Construction Co. Inc.,* 851 F.2d at 1528; *Hennegan v. Pacifico Creative Serv. Inc.,* 787 F.2d 1299, 1302 (9th Cir.), cert. denied, 479 U.S. 886, 107 S.Ct. 279, 93 L.Ed.2d 254 (1986); *Berkson v. Del Monte Corp.,* 743 F.2d 53, 55 (1st Cir.), cert. denied, 470 U.S. 1056, 105 S.Ct. 1765, 84 L.Ed.2d 826 (1985).

*Catfish,* 826 F.Supp. at 1030. While affirmative acts of concealment need not be shown in cases where the wrong is "self-concealing," such is not the situation under the facts at bar and the plaintiffs are required to demonstrate those acts in this case. *Id.* at 1032; *but see New York v. Hendrickson Bros., Inc.,* 840 F.2d 1065, 1084 (2nd Cir.1988) (holding antitrust conspiracy "necessarily includes concealment of the existence of the conspiracy, [and] proof of the conspiracy itself suffi[ces] to prove concealment by the co-conspirators."); Richard F. Schwed, *Fraudulent Concealment, Self–Concealing Conspiracies, and the Clayton Act,* 91 Mich.L.Rev. 2259 (1993) (urging federal courts to adopt uniform "self-concealing" standard for fraudu-

lent concealment in all antitrust cases). However,

the plaintiffs have alleged a pattern of conduct by the defendants which included face-to-face meetings and telephone calls—all conducted under the cloak of secrecy in furtherance of the conspiracy to fix the price of catfish. Such conduct of clandestine meetings and telephone conversations, if proven, is sufficient to establish the requisite "affirmative acts" of fraudulent concealment.

*Id.* Affirmative acts of concealment need not be separate from the conspiracy itself, and can be the same acts as those committed in furtherance of the conspiracy. *Allan Const.,* 851 F.2d at 1531; *but see Colorado v. Western Paving Const. Co.,* 630 F.Supp. 206, 210 (D.Colo.1986) (holding affirmative acts of concealment must be separate from acts "taken in carrying out the conspiracy itself."). Once this portion of the doctrine is met, the inquiry must turn to the remaining requirement:

The application of fraudulent concealment is not complete without a discussion of the "due diligence" requirement. In order to avail the doctrine of fraudulent concealment and its equitable tolling of the statute of limitations, the plaintiffs must show that they failed, despite the exercise of due diligence on their part, to discover the facts that form the basis of their price fixing claim. "[T]he statute of limitations is tolled only until such time as the plaintiff, exercising reasonable diligence, could have discovered the facts forming the basis for the claim." *Allan Construction Co.,* 851 F.2d at 1533. The plaintiffs need not have actual knowledge of the facts before the duty of due diligence arises; rather, knowledge of certain facts which are "calculated to excite inquiry" give rise to the duty to inquire. *Allan Construction Co.,* 851 F.2d at 1533; *In re Beef Antitrust Litig.,* 600 F.2d 1148, 1171 (5th Cir.1979); *Clement A. Evans & Co., Inc. v. McAlpine,* 434 F.2d 100, 102 (5th Cir.1970). cert. de-

crues to him to recover the damages caused by that act and that, as to these damages, the statute

of limitations runs from the commission of the act.").

nied, 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1971). The statute of limitations begins to run once plaintiffs are on inquiry that a potential claim exists. *United Klans of America v. McGovern*, 621 F.2d 152, 154 (5th Cir.1980); *Prather v. Neva Paperbacks, Inc.*, 446 F.2d 338, 341 (5th Cir.1971).

*Catfish*, 826 F.Supp. at 1032. With the foregoing in mind, the court must look to the evidence presented and determine if there exists evidence sufficient to create a genuine issue of material fact on these issues.

The plaintiffs have indeed presented testimony from various witnesses and other sources concerning secretive meetings and telephone calls to further the goals of the price-fixing conspiracy, as well as misinformation disseminated by the various defendants [6]. The evidence includes proof as to:

1. the existence of "internal minimum price lists" kept secret by Delta Pride while separate price lists were maintained for customer dissemination;

2. the use of cash by the defendants' agents for expenses related to price-fixing meetings, so that there would be no "paper trail" of their involvement;

3. the failure to keep minutes of trade association meetings where price-fixing was discussed [7]; and

4. false or incomplete explanations to customers as to why prices among the various members of the conspiracy were so close [8].

These types of evidence are sufficient to support a finding that the defendants engaged in affirmative acts of concealment to prevent the discovery of the conspiracy. The believability of this and related evidence, however, is for the jury to determine, and this evidence creates precisely the types of factual questions that should be reserved for resolution at trial.

## 2. THE PROOF

The plaintiffs have presented the court with an abundance of evidence pertaining to ConAgra's and Country Skillet's involvement in conspiratorial acts prior to February of 1988. Evidence of the presence of ConAgra/Country Skillet representatives at meetings and their involvement in price-fixing discussions is plentiful. Testimony given by its own employees and former employees even attests to such involvement.

Attendance and involvement by ConAgra/Country Skillet representatives at the first two Ramada Inn meetings, Sun & Sand Motel meetings and the Fishland Boardroom meeting is supported by the proffered evidence in this case. *E.g.*, Deposition of Sam Hinote, pp. 46–49; Testimony of Paul Barrett, *Hinote* I, Vol. II, pp. 158–62 [9]; Testimony of Harry T. McNamee, Jr., *Hinote* I, Vol. II, pp. 184–191; Testimony of Larry Joiner, *Hinote* I, Vol. I at 77–78.

---

**6.** If established to be members of a conspiracy, ConAgra and Country Skillet will be bound by the actions of fellow co-conspirators made in the furtherance of the conspiracy, if those actions could be reasonably foreseen as a necessary or natural consequence of the conspiracy. *United States v. Wilson*, 657 F.2d 755, 762 (5th Cir. Unit A 1981) (citing *Pinkerton v. United States*, 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946)); *United States v. Williams*, 31 F.3d 522, 526 (7th Cir.1994) (citing *Pinkerton*). Affirmative acts of concealment by one conspirator are the types of acts that could easily be imputed to other co-conspirators, such as in this case.

**7.** When asked why minutes were not kept at these meetings, Larry Joiner testified that "I certainly cannot speak for the others, but I certainly did not request minutes be kept because I thought the activities and some of the meetings [were] improper and illegal." Testimony of Larry Joiner, *Hinote* I, Vol. I, p. 83.

**8.** For example, William Dauler testified at his deposition as follows:

Q: At any time when you were in the catfish industry did a customer ever ask you something like why are all the prices the same?
A: I think they probably did.
Q: Did you ever tell them that was because we agreed on minimum prices?
A: No.
Q: What did you tell them?
A: Told them everybody has roughly the same costs, so the prices ought to be close.

Deposition of William Dauler, pp. 287–88.

**9.** Samuel Hinote was indicted by the Justice Department on criminal antitrust charges for activities related to circumstances surrounding this litigation. After a mistrial, he was tried again on the charges and acquitted.

Michael Lenn Brown has testified that while employed at Country Skillet, the issue of prices within a particular market would be raised, and Richard D. "Dickie" Stevens would respond by saying "Don't worry about that. That price has been taken care of. We've agreed to go up a certain price." Testimony of Michael Lenn Brown, *United States v. Hinote* I, Vol. III, pp. 187–88 (S.D.Miss. May 19, 1993). Brown stated that those prices were then put into effect by Country Skillet, and that these statements and price implementations occurred from 1984 up until sometime in late 1987 or early 1988. *Id.*

There is also evidence of consent by these defendants to price fixing at particular meetings and agreement to follow the fixed prices—while not having sent representatives in person to some of the meetings, ConAgra agreed to be bound by the prices agreed upon at those meetings.

Q: ... Was anything said about ConAgra not being there [at the meeting]?

A: Yes.

Q: What was said?

A: Someone asked at the first meeting what was the point of discussing prices when a processor as big as ConAgra was not even represented. And someone replied, "I talked with someone at ConAgra and they said that they would go along with whatever we did."

Q: And at the Duck Club meeting?

A: At the Duck Club Meeting, Bill Dauler—someone asked the same question, identically the same question; and Bill Dauler responded, "I talked with someone at ConAgra, and I have their proxy or I have their permission to do whatever we want, and they would go along with it."

Testimony of William H. Gidden, *Hinote* I, Vol. II, pp. 97–98.

10. *See, supra* note 4.

The preceding does not entail all of the available evidence on the issue, but is more than sufficient to demonstrate that there exist genuine issues of material fact which preclude the granting of summary judgment in this matter. However, even if the defendants were able to establish that they are entitled to a judgment as a matter of law with regard to the Clayton Act's statute of limitations, evidence of conspiratorial activity within the Clayton Act's limitations period could serve as the basis for a judgment against them.[10] Available evidence of conspiratorial involvement occurring after February of 1988 includes activities related to the Catfish Farmers of America meeting in 1990, which paints a picture of Country Skillet representatives conspiring to fix catfish prices in the Chicago market. *E.g.,* Testimony of Joseph T. Glover, Jr., *Hinote* I, Vol. III, pp. 201–09; Deposition of Joseph T. Glover, Jr., pp. 133–139. ConAgra and Country Skillet argue that this evidence of Chicago price fixing does not support the "nationwide conspiracy" theory of the plaintiffs in this case. The undersigned disagrees. It appears to the court that from the evidence available, the conspiracy of price-fixing which is charged by the plaintiffs is one in which prices were fixed separately by market. The fixing of prices in the Chicago market, for example, would only be a section of the web of conspiracy. Nonetheless, actions to fix prices in the Chicago market could be actions "in the furtherance of" a conspiracy to fix prices nationwide if the nationwide conspiracy operated in that manner. In any event, there exist genuine issues material fact in this matter, and the defendants are not entitled to a judgment as a matter of law for lack of evidence that these defendants participated in a nationwide conspiracy to fix prices of catfish.

## B. THE PLAINTIFFS' EVIDENCE OF DAMAGES—DR. JOHN C. BEYER

There has been much contention surrounding the potential testimony on damages of an expert witness for the plaintiffs, Dr. John C. Beyer. Indeed, Dr. Beyer's potential testimony has become a wellspring of motions in

this cause—motions to exclude expert testimony, motions to decertify class, motions for summary judgment, and even a *Motion to Intervene* filed by non-parties in other litigation where Dr. Beyer is also an expert witness [11]. It is the opinion of this court that now is not the proper time for resolution of all of these issues. Today the only concerns of the court are the parties' motions for summary judgment. As that is the case and since there are a plethora of other matters to be discussed, this court will hold in abeyance any decision on Dr. Beyer's testimony insofar as it relates to the defendants' motions for summary judgment. The remaining assertions as to those motions will be addressed, but this court will take up separately the matter of expert testimony.

■■■■■ In any event, the court notes that for the plaintiffs to avoid the grant of summary judgment on this aspect of the defendants' argument, all that would be required is the existence of a genuine issue of material fact regarding injury itself—"the fact of damage." *Sciambra v. Graham News,* 892 F.2d 411, 415 (5th Cir.1990); *Blue Bird Body Co.,* 573 F.2d at 317. An adequate showing of the amount of damages is not necessarily required for the plaintiffs to survive the defendants' motions for summary judgment on claims under the Clayton Act, because such a showing is only required for recovery of compensatory damages. Nominal damages as well as attorneys' fees can be awarded to the plaintiffs merely upon a showing that the plaintiffs have been "injured in [their] business or property" by antitrust violations. *Sciambra,* 892 F.2d at 415 ("We conclude that if a plaintiff can prove an antitrust violation and the fact of damage, the plaintiff is entitled to recover attorney's fees pursuant to section 4.") An award of attorneys' fees under the Clayton Act will usually be accompanied by an award of compensatory damages. However, this does not make such an award of attorneys' fees contingent upon a compensatory damage recovery. As the Fifth Circuit noted in *Sciambra:*

> In virtually all cases, therefore, an award of section 4 nominal or compensatory damages will accompany an award of section 4 attorney's fees. Nevertheless, it does not follow from this relationship that an attorney's fees award is dependent on a compensatory damages award. Our holding merely recognizes that the structure of section 4 and the fact of damage analysis make the actual recovery of compensatory damages irrelevant to the recoverability of attorney's fees.

*Sciambra,* 892 F.2d at 415. This fact is highly important to the court in its decision on this matter. Even if the defendants are able to establish that Dr. Beyer's testimony is insufficiently supported to uphold an opinion as to the amount of damages nationwide over the entire length of the charged conspiracy, the fact that there exists sufficient evidence of "the fact of damage" anywhere in the country to the plaintiffs circumvents the award of summary judgment on the plaintiffs' Clayton Act claims.

## V. DELTA PRIDE'S MOTION FOR SUMMARY JUDGMENT

The defendant Delta Pride has moved for summary judgment, and its sole asserted basis for relief is the insufficiency of the plaintiffs' expert to establish the "fact of damage" requirement of a Clayton Act claim. As has already been noted, this matter is held in abeyance until such time as it may be more properly considered.

## VI. FARM FRESH'S MOTION FOR SUMMARY JUDGMENT

Farm Fresh has moved for summary judgment on two grounds, namely that: 1) it cannot be held liable for any antitrust violations which occurred prior to its acquisition by Hormel Food Corporation on March 3, 1983; and 2) there is insufficient proof of conspiratorial actions by Farm Fresh prior

**11.** By order dated October 31, 1995, this court denied the motions of Bristol–Myers Squibb Co. and Mead Johnson and Co. to intervene in this cause for the purpose of obtaining Dr. Beyer's opinions in this case. *In re Catfish Litigation,* Master File No. 2:92cv73–D–O, MDL No. 928 (N.D.Miss. October 31, 1995) (order denying motions to intervene). The parties seeking intervention were defendants in other pending antitrust litigation in which Dr. Beyer had been retained as an expert witness for the plaintiffs.

to the beginning of the applicable statute of limitations.

## A. HORMEL'S ACQUISITION OF FARM FRESH AND PRE–ACQUISITION LIABILITY

On March 3, 1983, Geo. A. Hormel & Company purchased all the existing assets of Farm Fresh Farms, Inc.[12] ("Glover's Farm Fresh") as owned and operated by Joe Glover, Sr. In conjunction with this purchase of assets, Farm Fresh, Inc. was in effect converted into a wholly-owned subsidiary of Hormel ("Hormel's Farm Fresh"). The Purchase and Sale Agreement entered into by Hormel and Glover stated in part that Hormel's Farm Fresh would not be liable for any obligations or other liabilities of Glover's Farm Fresh.[13] This agreement also stated that "[t]his Agreement shall be construed and enforced in accordance with the laws of the State of Alabama." Purchase and Sale Agreement ¶ 14.1, Hormel's Deposition Exhibit # 644.

Farm Fresh presently contends that the Agreement's provision which entitles it to avoid liabilities of Glover's Farm Fresh should be enforced, and it should not be held liable for any antitrust violations of Glover's Farm Fresh occurring before March 3, 1983. In support of this assertion, Hormel directs the court to Fifth Circuit authority and decisions of its state of incorporation, Minnesota. The plaintiffs, in response, argue that the provision is unenforceable and that the law of Alabama directs the resolution of this issue.

### 1. WHICH JURISDICTION'S LAW CONTROLS?

Without fully addressing the issue, the parties have tendered the law which they feel should be applied to the matter at bar. Choice of law issues are determined by this court in accordance with Mississippi's conflicts of law rules when jurisdiction is based upon the diversity of the parties involved. *Alberto v. Diversified Group, Inc.,* 55 F.3d 201, 203 (5th Cir.1995) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941)). However, when this court's jurisdiction is based upon a federal question such as liability under the Clayton Act, any applicable state law rules of decision are to be determined via the application of federal conflicts of law rules. *Halkias v. General Dynamics Corp.,* 31 F.3d 224, 237 (5th Cir. 1994); *Gluck v. Unisys Corp.,* 960 F.2d 1168, 1179 n. 8 (3d Cir.1992). Federal conflicts of law rules are those of the Restatement (Second) of Conflicts[14]. *Morewitz v. West of England,* 62 F.3d 1356, 1363 (11th Cir.1995) (applying Second Restatement as federal conflicts of law); *Chuidian v. Philippine Nat'l Bank,* 976 F.2d 561, 564 (9th Cir.1992); *see also F.D.I.C. v. Massingill,* 24 F.3d 768, 775 (5th Cir.1994) (alluding to application of federal common law of conflicts).

The Restatement (Second) of Conflicts provides in relevant part that:

§ 187. Law of the State Chosen by the Parties

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could have not resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a funda-

---

**12.** Hormel also purchased the assets of other entities related to Mr. Glover and involved in the catfish industry. These entities included the Alabama corporation Farm Fresh Catfish Company and the Arkansas corporation Catfish, Inc.

**13.** *Liabilities.* It is hereby expressly agreed and understood that ... [the "new" Farm Fresh] shall assume no liabilities, obligations or undertaking of the Sellers or Glover of any kind or nature whatsoever, whether fixed or contingent, known or unknown, express or implied.

(Purchase and Sale Agreement ¶ 2.5, Hormel's Deposition Exhibit # 644). The Agreement then goes on to list specific examples of liabilities which are not assumed.

**14.** This court has previously noted that Mississippi also follows the Second Restatement in its resolution of conflicts of law issues. *E.g., Rieger v. Group Health Ass'n,* 851 F.Supp. 788, 791 (N.D.Miss.1994); *Dees v. Hallum,* 721 F.Supp. 789, 790 (N.D.Miss.1989).

mental policy of a state which has a fundamentally greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflicts, § 187 (Supp.1995). It appears without any legitimate dispute that Hormel's Purchase and Sale Agreement and its related purchase transaction had a "substantial relationship" to the state of Alabama. The Farm Fresh Catfish Company, which conducted regular business activity within Alabama, was an Alabama corporation as well as a party to this contract. Further, the parties have presented nothing to this court on whether the application of Alabama law would violate the public policy of a state with "a fundamentally greater interest" than Alabama. Particularly in the absence of evidence in this regard, this court is of the opinion that the choice of law provision of the Purchase and Sale Agreement should be enforced, and Alabama law applied to the question of whether the successor liability provision should be enforced as well.

In any event, the question of whether Minnesota, Alabama or Mississippi law applies to this issue does not appear to be one which would create a substantial disparity in result if decided improvidently. The law in this regard is fairly uniform regardless of which state provides the rule of decision, making the choice of which state's law applies non apropos. *See, e.g., Mozingo v. Correct Mfg. Corp.,* 752 F.2d 168, 174 (5th Cir. 1985) (making *Erie* guess as to Mississippi law); *Brown v. Economy Baler Co.,* 599 So.2d 1 (Ala.1992); *New York Life Ins. Co. v. Landmark Dev. Corp.,* 1993 WL 152157, *2 (Minn.App. May 11, 1993); *see also F.D.I.C. v. Massingill,* 24 F.3d 768, 775 (5th Cir.1994) (stating choice-of-law decisions need not be made when no conflict in results reached).

## 2. SUCCESSOR LIABILITY—THE PURCHASE AND SALE AGREEMENT PROVISION

Under Alabama law, the general rule is in accord with most states that:

[W]here one company sells or otherwise transfers all its assets to another company, the transferee is not liable for the debts and liabilities of the transferor unless (1) there is an express agreement to assume the obligations of the transferor, (2) the transaction amounts to a *de facto* merger or consolidation of the two companies, (3) the transaction is a fraudulent attempt to escape liability, or (4) the transferee corporation is a mere continuation of the transferor.

*Asher v. KCS Int'l,* 659 So.2d 598, 599 (Ala. 1995) (quoting *Andrews v. John E. Smith & Sons Co.,* 369 So.2d 781, 785 (Ala.1979)); *Brown v. Economy Baler Co.,* 599 So.2d 1, 3 (Ala.1992) (quoting *Andrews* ).

### (1) AGREEMENT

■ Contained in the Purchase and Sales Agreement are in fact assumptions of liabilities and obligations of Glover's Farm Fresh which were expressly accepted by Hormel's Farm Fresh. (Purchase and Sale Agreement ¶ 2.5, Hormel's Deposition Exhibit # 644). However, the liability which the plaintiffs seek to impose upon Hormel's Farm Fresh in this action was not an obligation or potential liability assumed in this agreement. There is no evidence before this court that Hormel's Farm Fresh expressly agreed to assume this liability. However, this assumption need not be express, for the rule "includes an implied agreement to assume the obligations of the transferor." *Morris Ave. Corp. v. Daniel Realty Corp.,* 429 So.2d 268, 271 (Ala.1983). Any implied assumption depends upon the particularized facts of each case, and in order to exist, the facts must reflect "an intention on the part of the buyer to pay the [obligation] of the seller." *Morris,* 429 So.2d at 271.

Under the facts presently before the court, the undersigned cannot say that there is sufficient evidence to justify a finding that Hormel's Farm Fresh implicitly assumed obligations for any antitrust violations. However, as this matter will be presented at trial for other reasons, it is the opinion of the

undersigned that the plaintiffs should be permitted the opportunity to present any available relevant evidence on this exception as well.

### (2) "MERE CONTINUATION"/*DE FACTO* MERGER

■ The Alabama Supreme Court has adopted a four-factor test for determining whether a purchasing corporation is a "mere continuation" of the seller. "Substantial evidence" of each of these four factors may establish the purchaser as a successor corporation, and the determination of the issue is a jury question. *Brown,* 599 So.2d at 3; *Pietz v. Orthopedic Equip. Co.,* 562 So.2d 152, 156 (Ala.1989). The factors are:

1) There was basic continuity of the enterprise of the seller corporation, including, apparently, a retention of key personnel, assets, general business operations and even the [seller's] name.

2) The seller corporation ceased ordinary business operations, liquidated, and dissolved soon after distribution of consideration received from the buying corporation.

3) The purchasing corporation assumed those liabilities and obligations of the seller ordinarily necessary for the continuation of the normal business operations of the seller corporation, and

4) The purchasing corporation held itself out to the world as the effective continuation of the seller corporation.

*Asher,* 659 So.2d at 599; *Brown,* 599 So.2d at 3; *Pietz,* 562 So.2d at 156. "These factors are to be considered in the conjunctive, not in the alternative." *Brown,* 599 So.2d at 3. The analysis is known as the "continuity of enterprise" test and is also used in a *de facto* merger analysis. *Matrix–Churchill v. Springsteen,* 461 So.2d 782, 786 (Ala.1984); *see also New York Life,* 1993 WL 152157, *2.

It appears that there exist sufficient facts pertaining to the elements listed in the first portion of this analysis. While it is true that Hormel placed new persons within the new corporation, key personnel were retained to operate Hormel's Farm Fresh, most notably

Mr. Joseph T. Glover, Sr. himself as President of Hormel's Farm Fresh. Substantial amounts of assets were retained in the new corporation, as were the general business operations and the "Farm Fresh" trade name. Secondly, it does not appear to be disputed that Glover's Farm Fresh and its sister companies ceased operations, liquidated and dissolved soon after the exchange of assets here. Indeed, as the plaintiffs have noted, the Purchase and Sale agreement specifically provided for such.[15] With regard to the third factor, the agreement likewise provided that Hormel's Farm Fresh expressly assumed a litany of obligations which appear to be of a kind "ordinarily necessary for the continuation of normal business operations," such as debts for the purchase of equipment used in the business. Purchase and Sale Agreement ¶ 2.5 and Schedule 2.3(c), Hormel's Deposition Exhibit # 644. Finally, the undersigned finds that there is sufficient evidence for a jury to determine that Hormel's Farm Fresh held itself out as effectively continuing the "Farm Fresh" business, and this court will leave such a determination for trial.

### (3) FRAUD

Much like this court's analysis of the "assumption" exception to the general rule of the liability of a successor corporation, there does not appear at this time sufficient evidence to justify a finding of outright fraud on behalf of Hormel's Farm Fresh to avoid potential antitrust liabilities. Again, however, this court shall give deference to the plaintiffs and allow this matter to proceed to trial with the other considerations of successor liability.

### B. FARM FRESH AS A MEMBER OF THE CONSPIRACY

#### 1. PARTICIPATION

As with the other defendants in this cause, there does exist evidence of participation by Farm Fresh in conspiratorial acts to fix prices of catfish and catfish products. At a minimum, the plaintiffs have adduced evidence of the involvement of Mr. Glover, Sr.

---

**15.** The terms of the agreement stated that "[p]romptly after the Closing, each of Farm Fresh Catfish, Inc., Catfish, Inc. and Farm Fresh Farms Inc. will be liquidated and dissolved." Purchase and Sale Agreement ¶ 10.1, Hormel's Deposition Exhibit # 644.

in the Duck Club Meetings and the Church's Fried Chicken/Ramada Inn meeting and the resulting price fixing agreements. *E.g.,* Deposition of Sam Hinote, pp. 88–101; Testimony of William H. Gidden, *Hinote I,* Vol. III, pp. 73–75; Deposition of Larry Joiner, pp. 295–98; 301–02. While Farm Fresh does not concede involvement in conspiratorial acts, it does contend that if it was ever involved in such a conspiracy, it effectively withdrew from participation in it such that it has avoided at least some level of liability.

## 2. WITHDRAWAL FROM THE CONSPIRACY

 Once proven to be involved in a conspiracy, a defendant is normally presumed to continue its involvement in that conspiracy. *United States v. Vaquero,* 997 F.2d 78, 82 (5th Cir.1993). In order to establish the affirmative defense of withdrawal from the conspiracy, thereby overcoming this presumption, a defendant has the burden of showing "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators." *Vaquero,* 997 F.2d at 82 (quoting *United States v. United States Gypsum Co.,* 438 U.S. 422, 464–65, 98 S.Ct. 2864, 2887, 57 L.Ed.2d 854 (1978)); *United States v. MMR Corp. (LA),* 907 F.2d 489, 499–500 (5th Cir.1990) (same). The burden of showing withdrawal is heavy, for "the defendant cannot set in motion a criminal scheme and then limit its responsibility for the harm caused by the scheme by simply ceasing to participate in the scheme." *Armco Steel Co., L.P. v. CSX Corp,* 790 F.Supp. 311, 322 (D.D.C.1991). The act of withdrawal must be affirmative, for "merely ceasing participation in the conspiracy, even for extended periods of time, is not enough to evidence withdrawal." *United States v. Sax,* 39 F.3d 1380, 1386 (7th Cir.1994); *See also United States v. Phillips,* 664 F.2d 971, 1018 (5th Cir.1981); *United States v. Antar,* 53 F.3d 568, 582 (3rd Cir.1995); *United States v. Nava–Salazar,* 30 F.3d 788, 789 (7th Cir. 1994) ("Withdrawal requires that the conspirator make himself 'completely unavailable for the conspiracy's purposes.'").

 Some time after Hormel's acquisition of Farm Fresh, Hormel's legal department produced an advisory memorandum concerning the danger of potential antitrust violations of Farm Fresh employees. This memo, Farm Fresh argues, provided the impetus for withdrawal:

[A]fter the Duck Club meeting in Spring 1984, [Larry] Joiner told Sam Hinote, President of Delta Pride, that the discussions were improper and he would no longer participate. A short time later, after discussing the Hormel memorandum with Bill McCormack on May 8, 1994, Larry Joiner called Don Haynie, then at Country Fresh and President of the [American Catfish Marketing Association], and requested that legal counsel be present at future ACMA meetings to prevent any improper discussions. A letter on May 25, 1984, followed from Haynie conveying this request to all ACMA members. In addition to notifying the membership of the ACMA, Joiner went further and on May 8, 1984, the same date as the Hormel memo, wrote to Doug McCrory at the Bank of Moorehead. Mr. Joiner stated that "I have been advised by our Hormel legal counsel that it would be inadvisable for me to attend future meetings of the Lender/Processor Group unless there is an attorney present. The attorney would serve to insure no improper questions/discussions were initiated concerning pricing, etc. of finished products."

Mr. Joiner's broadcast was heard. Mr. Haynie asked Mr. Joiner for a recommendation as to legal counsel and Mr. Joiner recommended Barry Cannada. Mr. Cannada appeared at the next meeting of the ACMA on June 6, 1984 and made a presentation concerning the antitrust laws and communications with competitors. At that meeting Mr. Joiner also expressed his concerns regarding improper discussion among competitors and went so far as to make a motion that an attorney be retained for all future ACMA meetings, which motion was approved. *See* McNamee Deposition at 183; Deposition Exhibit 160.

By letter dated June 18, 1984, Mr. Joiner forwarded Mr. Haynie the Hormel memo for distribution to the ACMA mem-

bership, and specifically referenced his comments at the June 6, 1984 meeting about the "dangers inherent with us conducting trade association meetings without legal counsel present to keep us away from 'sensitive' subjects." Deposition Exhibit 345. . . .

Farm Fresh's Brief in Support of its Motion for Summary Judgment, pp. 13–15. Farm Fresh essentially argues that it withdrew from any conspiratorial involvement in the spring of 1984, and it should not be held liable for any antitrust violations of the conspiracy after that period.[16]

■ In any event, the determination of whether a party has withdrawn from a conspiracy is a question of fact. *United States v. Bafia,* 949 F.2d 1465, 1480 (7th Cir.1991); *Wolf v. City of Chicago Heights,* 828 F.Supp. 520, 523 (N.D.Ill.1993). Therefore, today's question for the court in this regard is whether there is sufficient evidence to create a genuine issue of material fact as to Farm Fresh's claim of withdrawal from the conspiracy. The plaintiffs dispute the effectiveness of this claimed withdrawal, and charge that any efforts of Farm Fresh to withdraw fell woefully short of success.

The undersigned is of the opinion that, particularly in light of the fact that it is Farm Fresh's burden to establish withdrawal, there exist genuine issues of material fact as to Farm Fresh's withdrawal from the charged conspiracy, and this matter shall be presented to the jury upon trial of this cause. However, even if Farm Fresh's withdrawal from the conspiracy was complete by virtue of the Hormel memorandum and subsequent actions, Farm Fresh may have obviated any protection by later participation and re-entry into the conspiracy. *See, e.g., United States v. Starrett,* 55 F.3d 1525, 1555 (11th Cir.1995) (stating "[the defendant's] continued participation in the criminal activity which he claims to have disavowed negates his withdrawal defense."). There is in fact evidence of such later participation. For example, there is evidence of price-fixing discussions in the Chicago area market during the time period of 1987 through 1990. *E.g.,* Deposition of Joseph T. Glover, Jr. pp. 109–112; Deposition of Henry Williams, pp. 201; Affidavit of Karen Hanson, Exhibit Y. Farm Fresh disputes the validity and worth of the evidence in this regard in several ways, and will be permitted to do so again at trial. However, due to the nature and background of this case, this court feels that the best course is to allow these claims to proceed to a full hearing on the merits. *See supra* at page 410.

There exist genuine issues of material fact as to whether Hormel's Farm Fresh is liable as a successor corporation for the potential antitrust violations of Glover's Farm Fresh, whether sufficient evidence exists to hold Farm Fresh liable as a member of a conspiracy to fix catfish prices, and whether Farm Fresh effectively withdrew from the conspiracy. These determinations should be made by the trier of fact after a full hearing of the merits of this cause. In that the defendant Farm Fresh is not entitled to the entry of a judgment as a matter of law, Farm Fresh's motion for summary judgment shall be denied.

## VII. HORMEL'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs assert liability against the defendant Hormel on two related grounds. First, the plaintiffs charge that Hormel was directly involved in the conspiracy. They also charge that Hormel is liable for the actions of Farm Fresh, its wholly-owned subsidiary. Under this second allegation, the plaintiffs charge that Hormel is liable because either: 1) the corporate entity of Farm Fresh Catfish should be disregarded as a limitation upon liability, or 2) Hormel knew of this conspiracy and accepted the benefits of it. Hormel has moved this court for the entry of summary judgment on the plaintiffs' claims against it.

The principal argument contained in the parties' submissions in this matter revolves

---

**16.** Naturally, Farm Fresh would not be protected from any conspiratorial acts occurring before withdrawal.

around the issue of whether the corporate entity of Farm Fresh should be disregarded as a limitation upon liability for its sole shareholder, the defendant Hormel. More precisely, the plaintiffs argue that Hormel was the "alter ego" of Farm Fresh.

### A. THE LAW TO BE APPLIED— STATE OR FEDERAL COMMON LAW

There does not appear to be any disagreement among the parties as to the law which they feel is to be applied on this issue. Both the plaintiffs and Hormel largely confine their discussions of law to cases which discuss the use of federal common law to determine whether the corporate veil should be pierced. *E.g., In re Sims,* 994 F.2d 210 (5th Cir.1993); *United States v. Jon–T Chemicals, Inc.,* 768 F.2d 686 (5th Cir.1985). The undersigned is not necessarily convinced that federal common law controls this issue of the case. The more proper course might be the application of appropriate conflicts of law rules to determine the controlling substantive state law on disregarding the corporate entity. *See, e.g., United States v. Clinical Leasing Serv., Inc.,* 982 F.2d 900, 902 (5th Cir. 1992) (applying Louisiana substantive law of veil piercing in claim arising under Federal Controlled Substances Act). This court's jurisdiction is based upon a federal question, and the Fifth Circuit has never determined "whether a uniform federal alter ego rule is required" in a case where federal law governs. *Sims,* 994 F.2d at 218 n. 11; *Jon–T Chemicals,* 768 F.2d at 690 n. 6; *Joslyn Corp. v. T.L. James & Co.,* 696 F.Supp. 222, 226 (W.D.La.1988). Regardless, this court agrees with the Fifth Circuit's conclusion in *Jon–T* that "federal and state alter ego tests are essentially the same. [Fifth Circuit] non-diversity alter ego cases have rarely stated whether they were applying a federal or state standard, and have cited federal and state cases interchangeably." *Jon–T,* 768 F.2d at 690 n. 6. Therefore, since the results would be essentially the same, this court shall proceed to apply the appropriate federal common law as proposed by the parties in this matter.

### B. THE APPLICABLE STANDARD

When a party alleges that the corporate form of a subsidiary should be disregarded as a limitation upon liability of a parent corporation under the "alter ego" theory, that party in essence charges that the parent corporation "totally dominates and controls the subsidiary, operating the subsidiary as its business conduit or agent." *Id.* at 691. The amount of control required is that which "amounts to the total domination of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation." *Joslyn Mfg. Co. v. T.L. James & Co.,* 893 F.2d 80, 83 (5th Cir.1990) (quoting *Krivo Indus. Supply Co. v. National Distillers & Chem. Corp.,* 483 F.2d 1098, 1106 (5th Cir.1973)). To determine whether sufficient domination and control are present, the fact-finder must consider the totality of the circumstances. As the parties in the case at bar have noted, there are many relevant factors that can be considered in this determination, such as whether:

1) the parent and the subsidiary have common stock ownership;

2) the parent and the subsidiary have common directors and officers;

3) the parent and the subsidiary have common business departments;

4) the parent and the subsidiary file consolidated financial statements and tax returns;

5) the parent finances the subsidiary;

6) the parent caused the incorporation of the subsidiary;

7) the subsidiary operates with grossly inadequate capitol;

8) the parent pays the salaries and other expenses of the subsidiary;

9) the subsidiary receives no business except that given to it by the parent;

10) the parent uses the subsidiary's property as its own;

11) the daily operations of the two corporations are not kept separate; and

12) the subsidiary does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings.

*Sims,* 994 F.2d at 218 n. 12; *Jon–T,* 768 F.2d at 691–92. Additional factors that may be considered include:

1) whether the directors and officers of the subsidiary act independently in the interest of that company, or whether they take their orders from the parent and act in the parent's interest; and

2) the connection of the parent's employee, officer or director to the subsidiary's tort or contract giving rise to the suit.

*Jon–T,* 768 F.2d at 692. Because the totality of the circumstances is to be considered, no single factor or combination of factors is controlling on the issue. This determination is highly fact-specific, and there is no "litmus test." *Id.* at 694; *In re Guyana Dev. Corp.,* 168 B.R. 892, 907 n. 29 (Bkrtcy.S.D.Tex.1994) (citing *Jon–T* ). "Even if all [of the factors] are found to be applicable, other circumstances might justify a refusal to pierce the corporate veil." *Sims,* 994 F.2d at 218 n. 12.

Aside from debate on evidence of control, the defendant Hormel argues that some sort of inequity is required before the corporate veil can be pierced. "[W]e must remember that the alter ego doctrine and piercing of the corporate veil are truly exceptional doctrines, reserved for those cases where the officers, directors or stockholders utilized the corporate entity as a sham to perpetrate a fraud, to shun personal liability, or to encompass other truly unique situations." *Matter of Multiponics, Inc.,* 622 F.2d 709, 725 (5th Cir.1980). However, fraud or inequity is not normally required to be shown when the cause of action does not sound in contract, but rather in tort. *Alberto v. Diversified Group, Inc.,* 55 F.3d 201, 206 (5th Cir.1995); *Jon–T,* 768 F.2d at 692. Hormel has not argued nor presented any authority or evidence demonstrating to this court that the plaintiffs' claims sound in contract so that a showing of fraud is required in this case. Regardless, the situation that the plaintiffs argue in this case seems to be one in which Hormel seeks to shun personal liability without conforming to the confines of required corporate responsibilities and boundaries. Hormel argues that a parent's "typical control" over its subsidiary does not justify piercing the corporate veil. It is indeed im-portant, when considering the plethora of relevant factors, not to lose sight of the real issue to be decided—control. Hormel also strongly contends the facts surrounding the relationship between itself and Farm Fresh are not unusual, and that "Hormel Foods exercised just about the same degree of 'dominance' as is exercised by publicly held companies—ranging in size and business from virtually every bank holding company in this state to every major international corporation." Even if this is proven true, the undersigned does not believe that this fact would entitle Hormel to summary judgment in this matter. As every mother eventually tells her child, simply because "everyone else is doing it" is not an absolute defense and does not mean that Hormel can avoid the legal consequences of its actions. Any "typical control" contemplated in Fifth Circuit jurisprudence would be more accurately considered as the "typical control" that a parent ought to exercise over its subsidiary within the confines of corporate law, and not what control is typically exerted within a given industry. The status of the law in this matter is established in the courts and the legislative houses, not by the whim of industry or its norm.

The parties have presented to the court a multitude of genuine factual issues and arguments which require the consideration of a jury before their resolution can be achieved. Indeed, the defendant has admitted to the existence of several of the pertinent factors to be considered. While the existence of these factors is not necessarily determinative, the defendant cannot dispute their relevance. Coupled with additional factual issues raised when considering the plaintiffs' submissions on this matter, the undersigned is of the opinion that this matter should most certainly be presented to the trier of fact at trial on the merits. It is the opinion of this court that a reasonable trier of fact could determine that the Farm Fresh corporate entity was merely a bogus shell for Hormel to seek protection behind while operating in the catfish industry. Hormel's motion for summary judgment shall be denied.

## VIII. CONCLUSION

The merits of motions for summary judgment are determined using the dictates of Federal Rule of Civil Procedure 56. While the determining standard is not altered for antitrust litigations, cases such as the one at bar do not readily lend themselves to resolution by summary judgment. In *Poller v. Columbia Broadcasting Sys.*, the United States Supreme Court recognized this fact:

> [S]ummary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury ...

*Poller v. Columbia Broadcasting Sys.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *see also Consolidated Metal Prod. v. American Petro. Inst.*, 846 F.2d 284, 288 n. 5 (5th Cir.1988).

In any event, this court has the discretion, which it exercises here, to allow the plaintiffs' claims to proceed to trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986) ("Neither do we suggest ... that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial."); *Rodeway Inns Intern. v. Amar Enterp.*, 742 F.Supp. 365, 369 n. 5 (S.D.Miss. 1990) ("[A] district court may, in its discretion, deny the motion [for summary judgment] in order to give the parties the chance to fully develop the facts at trial."). In light of this court's recent ruling to release certain grand jury transcripts,[17] additional evidence may also come to light which has not yet been presented to this court for consideration. The motions of the defendants shall be denied.

---

**17.** *See In re Catfish Litigation*, Master File No. 2:92cv73–D–O, MDL No. 928, 1995 WL 714451 (N.D.Miss. October 2, 1995) (Memorandum

A separate order in accordance with this opinion shall issue this day.

Opinion and Order Releasing Grand Jury Transcripts).